1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DNA GENOTEK INC., | Case No.:  21cv516-DMS-LL |
| Plaintiff, | **ORDER ON CROSS MOTIONS TO COMPEL** |
| v. | |
| SPECTRUM SOLUTIONS L.L.C., | **[ECF Nos. 46, 51]** |
| Defendant. | |
| AND RELATED COUNTERCLAIMS | |

Defendant and Counter Claimant Spectrum Solutions L.L.C. ("Spectrum") moves the Court for an order compelling Plaintiff and Counter Defendant DNA Genotek Inc. ("Genotek") to produce arbitration documents and document retention policies. ECF No. 46. Genotek, in turn, moves to compel Spectrum to produce financial information, valuation documents, and documents about manufacturing location and labeling. ECF No. 51. Both parties filed responses in opposition [ECF Nos. 55, 56] and replies [ECF Nos. 58, 60]. For the below reasons, Spectrum's Motion to Compel [ECF No. 46] is **GRANTED**. Genotek's Motion to Compel [ECF No. 51] is **GRANTED IN PART** and **DENIED IN PART**.

**LEGAL STANDARD**

"A district court is vested with broad discretion to permit or deny discovery." <u>Laub v. U.S. Dep't of Interior</u>, 342 F.3d 1080, 1093 (9th Cir. 2003). Unless otherwise limited by court order, the scope of discovery under the Federal Rules of Civil Procedure is as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Courts must limit the frequency or extent of discovery if it determines that:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C).

"[A] party may move for an order compelling disclosure of discovery." Fed. R. Civ. P. 37(a)(1). "The party seeking to compel discovery has the burden of establishing that its request satisfies the relevancy requirement of Rule 26(b)(1)." <u>La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer</u>, 285 F.R.D. 481, 485 (N.D. Cal. 2012). "The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." <u>Blankenship v. Hearst Corp.</u>, 519 F.2d 418, 429 (9th Cir. 1975).

**BACKGROUND**

Genotek's Second Amended Complaint alleges that Spectrum's saliva collection devices infringe U.S. Patent Nos. 10,619,187 ("the '187 patent") and 11,002,646 ("the '646

2

patent"). ECF No. 20. Specifically, Genotek alleges that Spectrum's SDNA-1000 and SDNA-2000 saliva collection devices infringe the '187 patent. As a result, Genotek seeks a royalty. Id. In response, Spectrum filed counter claims for inequitable conduct, monopolization, and attempted monopolization. ECF No. No. 27. Genotek's motion to dismiss these counter claims is currently pending. ECF No. 41. Both parties now seek orders to compel the other to produce certain discovery.

## DISCUSSION

### I.    Spectrum's Request for Arbitration Materials

According to Spectrum, in 2015, Genotek sued Ancestry.com DNA LLC ("Ancestry") and Spectrum for alleged patent infringement and breach of contract. ECF No. 46-1. At the time, Spectrum was Ancestry's manufacturer. Spectrum also sold small amounts of the same product it made for Ancestry. Genotek asserted the '115 patent, which is a parent of the '187 patent, and both patents share a common specification. In 2017, Genotek, Ancestry, and Spectrum entered into a Settlement and License Agreement (the "Settlement Agreement") resolving that litigation. Thereafter, Genotek and Ancestry disputed whether the Settlement Agreement covered certain new Ancestry products and commenced a binding arbitration to resolve the dispute. Id. at 7. In February 2020, an arbitration panel found the Ancestry products did not infringe Genotek's asserted patents. Ancestry then initiated a second arbitration with Genotek. In March 2021, Genotek and Ancestry settled the second arbitration. Thereafter, on March 24, 2021, Genotek filed this lawsuit against Spectrum.

In Spectrum's Request for Production ("RFP") Nos. 24, 25, 26, 27, and 34, Spectrum requested pleadings, contentions, briefs, transcripts, discovery, and other documents from the Ancestry arbitrations. ECF No. 46-8. Specifically, Spectrum requested:

**REQUEST FOR PRODUCTION NO. 24:** All pleadings and contentions from any litigation or arbitration concerning the Asserted Patents or any Related Applications, including any arbitration involving Ancestry.com DNA, LLC.

3

**REQUEST FOR PRODUCTION NO. 25:** All pleadings and contentions from any litigation or arbitration concerning any Related Applications.

**REQUEST FOR PRODUCTION NO. 26:** All pleadings, contentions, briefing, hearing transcripts, depositions transcripts, discovery requests and responses thereto, and the February 2020 decision of the arbitration panel in Your arbitration with Ancestry.com DNA, LLC regarding "whether certain new Ancestry products are covered by the Licensed Patents" as referenced in Your 2020 annual report.

**REQUEST FOR PRODUCTION NO. 27:** All pleadings, contentions, briefing, hearing transcripts, deposition transcripts, discovery requests and responses thereto, and decisions of the arbitration panel in the arbitration initiated by Ancestry.com DNA, LLC in the third quarter of 2020 as referenced in Your 2020 annual report.

**REQUEST FOR PRODUCTION NO. 34:** All contentions, including infringement, non-infringement, validity, and invalidity contentions, served by any party in any contentious matter, arbitration, mediation, or demand letter regarding the Asserted Patent or Related Application, including any arbitration involving Ancestry.com DNA, LLC.

Id.

Genotek refused to provide the materials because "[u]nder Section 10.5 of the Settlement and License Agreement, to which Spectrum is a party, all arbitrations between DNA Genotek and Ancestry are confidential[.]" ECF No. 46-11 at 10–11. Genotek further responded that "Spectrum contractually agreed that any arbitrations between DNA Genotek and Ancestry would remain confidential" and "[t]he contract among Spectrum, Ancestry, and DNA Genotek makes no exception to that agreement if Spectrum and DNA Genotek are later in litigation with one another." ECF No. 46-15 at 5.

In its motion, Spectrum argues the arbitration materials are relevant because: (1) the Ancestry arbitrations "involved" the asserted '187 patent and related patents; (2) the materials "will reveal Genotek's positions regarding the scope and interpretation of the asserted claims as they relate to a product 'not colorably different' from the accused product in this case;" (3) "Genotek may be judicially estopped from taking positions inconsistent with those it took in the arbitrations;" (4) "the settlement of the second

4

arbitration between Genotek and Ancestry may have resulted in a license under the '187 patent to Ancestry [which] would plainly be relevant to the determination of a reasonable royalty rate in the present case. ECF No. 46-1 at 11. Spectrum also notes that it did not request all documents produced in the Ancestry arbitrations, but only those "concerning litigations or arbitrations involving the asserted '187 patent and its direct parent." Id. at 10.

Genotek does not meaningfully dispute the relevancy of the requested arbitration materials. Genotek merely argues, in footnotes, "that Spectrum incorrectly states that the three prior and separate lawsuits among DNA Genotek, Ancestry, and Spectrum are closely connected to the arbitrations." ECF No. 56 at 7 n.1. Genotek further argues:

> The first of the two arbitrations did not involve the same patents asserted in this litigation. The second arbitration has an overlapping patent, but was resolved without an arbitration decision. Because there is no overlap between the patents in the first arbitration and the present case, discovery from the first arbitration is especially irrelevant and not proportional to the needs of this case.

Id. at 11 n.3. However, arguing that the lawsuits are not "closely connected" and pointing out that the second arbitration involving "an overlapping patent" was resolved without an arbitration decision, is not the same as arguing that all of Spectrum's requests seek irrelevant information. Regardless, Spectrum concedes it is not requesting all documents produced in the Ancestry arbitrations, only those "concerning litigations or arbitrations involving the asserted '187 patent and its direct parent" that are "likely to contain substantive information relevant to this lawsuit." ECF No. 46-1 at 10 n.4. To the extent the first arbitration did not involve the asserted '187 patent and its direct parent, Spectrum is apparently not requesting those documents.[1] Accordingly, Spectrum has shown the

---

[1] This concession by Spectrum also appears to address, at least to some degree, Genotek's complaint that "Spectrum has not narrowed these requests during any meet and confer" and that producing all documents relating to the arbitrations would not be proportional to the needs of the case. See ECF No. 56 at 12.

requested information is relevant if only because it relates to the asserted patents and may reasonably lead to admissible evidence.

Genotek primarily argues that, in the Settlement Agreement, Spectrum agreed it could not "access" any arbitration materials and that Spectrum agreed it "would not be allowed to obtain confidential arbitration documents and later twist the private and purposely simplified statements of the parties and arbitrators against DNA Genotek or Ancestry in a separate proceeding." ECF No. 56 at 6–7. Genotek claims the Settlement Agreement: (1) "was an arrangement entered into in the context of litigation, which specifically contemplated future disputes between the parties;" (2) "makes no exception to the confidentiality requirement for future litigation discovery;" and (3) "was intended to prevent" the production of the arbitration materials "'in later litigation involve[ing] the same parties to the Settlement Agreement.'" Id. at 7–8. Genotek therefore argues that "[b]y moving to compel the production of these documents, Spectrum is reneging on its promise to keep these documents confidential." Id. at 7.

Genotek does not, however, quote any specific language from the Settlement Agreement supporting its argument. Rather, Genotek generally cites the arbitration clause at paragraph 10.5, which provides in pertinent part:

> The decision rendered by the arbitrators will be final and binding upon the Parties, and judgment upon the binding decision may be entered by any court of competent jurisdiction. . . . Except as otherwise required by law, all communications, whether oral, written or electronic, in any arbitration pursuant to this Section, and any result thereof, will be treated as confidential.

ECF No. 48-1 at 27.[2] This language does not, as Genotek argues, expressly prohibit

---

[2] Genotek also cites clause 8.4, the survival clause, which provides:

> Section[] . . . . 10 will survive the expiration and any termination of this Agreement. Except as otherwise provided in this Section 8.4, all ongoing rights and obligations of the parties under this Agreement will terminate upon the expiration or termination of this Agreement; provided that, upon termination of this Agreement, nothing in this Agreement will be construed to

Spectrum from accessing the materials generated by an arbitration through discovery in a subsequent lawsuit between Genotek and Spectrum. Genotek has not shown: (1) that the term "parties" was necessarily intended to include Spectrum; (2) that the "[e]xcept as otherwise required by law" provision was intended to exclude disclosures in response to a proper discovery request by Spectrum or any other party to a subsequent lawsuit; or (3) that the parties' agreement to treat arbitration materials as "confidential" in the Settlement Agreement is inconsistent with Spectrum's obligation and agreement to treat discovery materials designed by Genotek as "confidential" or "highly confidential" under the Protective Order. See ECF No. 34-1 at 4–9.

Although Genotek argues that "[w]hile a protective order is a tool used to protect a party's sensitive information from disclosure, it is not a means to undo a contract between the litigants," [ECF No. 56 at 11], Genotek does not point to any specific language in the Settlement Agreement, or any other evidence or authority, suggesting that the disclosure of arbitration materials subject to the conditions in the Protective Order would "undo" any part of the Settlement Agreement. Moreover, although Genotek points out that "after the arbitration agreement was signed, separate disputes have arisen between Ancestry and Spectrum on the one hand, and DNA Genotek and Spectrum, on the other hand," [id. at 8], it does not claim that Spectrum ever acted as if it agreed with Genotek's current interpretation of paragraph 10.5 in engaging in these disputes. Ultimately, Genotek's arguments with respect to paragraph 10.5 are not rooted in the text of the agreement or the behavior of the parties, and do not sufficiently account for the protections contained in the Protective Order.

Genotek secondarily argues that Spectrum should be denied access to the arbitration

---

waive any right of any Party or release any Party of any obligation hereunder that arose, matured or accrued prior to the effective date of such termination.

ECF No. 48-1 at 23.

materials through discovery based on the public policy and law of Delaware, which governs the Settlement Agreement. ECF No. 56 at 9–10. While Genotek cites several cases articulating the policy in favor of protecting the confidentiality of arbitration materials in order to promote alternative dispute resolution, id. at 10, Genotek does not attempt to compare the facts of any such case with the facts here, unique as they may be, including the terms of paragraph 10.5. Moreover, none of the cases cited by Genotek address whether protective orders containing terms similar to those in the Protective Order are insufficient to protect the public policy interest recognized under Delaware law.

Genotek's remaining arguments are also unavailing. First, Genotek argues that Spectrum's judicial estoppel argument is not persuasive because judicial estoppel only prevents a party who successfully maintains a position from later assuming a contrary position. ECF No. 56 at 12. The Court agrees, but notes that this is just one of the cited reasons Spectrum claims the arbitration materials are relevant. If the materials contain the information Spectrum hopes they do, it is not hard to see how that information might be useful to Spectrum in anticipating Genotek's position and crafting defenses. Second, Genotek argues that "Spectrum's contention that the documents will show Ancestry's prior defenses fares no better" because "[p]rior art can be discovered from publicly available sources or alternative discovery requests." Id. Again, however, it does not appear based on the parties' filings that discovery of prior art will provide the same information contained in the arbitration materials, and even if there was some overlap, that the information would be unreasonably redundant or cumulative. Finally, Genotek argues that "Spectrum's argument that its requests would be relevant to patent license royalty rates . . . . is without merit" because "[t]he requests at issue in Spectrum's motion do not seek license agreements on their face" and "Genotek has already agreed to produce licenses relating to the '187 patent in response to a different document request." Id. If Spectrum is correct that "the settlement of the second arbitration . . . . resulted in a license under the '187 patent to Ancestry, [ECF No. 46-1 at 11], the Court agrees this information would be relevant to the determination of a reasonable royalty rate in the present case, if only to determine whether

the license and royalty rate was the result of protracted arbitration. To the extent the information might be cumulative because Genotek has already agreed to provide licensing information, Genotek has not shown that it would be unreasonably cumulative. Accordingly, based on the above, Spectrum's Motion to Compel responses to RFP Nos. 24, 25, 26, 27, and 34 is **GRANTED**. The parties shall promptly meet and confer on the timeframe in which Genotek will respond.

## II.   Spectrum's Request for Document Retention Policies

In RFP No. 69, Spectrum requested "[d]ocuments sufficient to show your document and record retention policies from 2002 to the present, including procedures and facilities for generating, maintaining and disposing of records, including electronic records, files, and messages." ECF No. 46-1 at 14. Genotek objected on the grounds of relevancy and declined to produce the documents. Id. Genotek subsequently agreed only to produce its most recent document retention policy from 2020, despite having represented that it did not have emails from before 2008. Id. Spectrum argues that "[e]mails before 2008 are relevant, for example, to Spectrum's invalidity and inequitable conduct defenses because those allegations relate to the invention, filing, and prosecution of the '187 patent, which Genotek claims began in 2002." Id. at 15.

In support of this argument, Spectrum cites McMorrow v. Mondelez Int'l, Inc., Case No.: 17-cv-02327-BAS (JLB), 2019 WL 3852498, at *3 (S.D. Cal. Apr. 19, 2019), in which the court found:

> Courts in this Circuit have . . . . found that document retention policies may be relevant under Rule 26. . . . [C]ourts which have found that document retention policies may be relevant have taken different approaches to determining when it is appropriate to order production. On one end of the spectrum, some courts permit discovery of document retention policies without any preliminary showing by the moving party of spoliation or discovery misconduct. On the opposite end of the spectrum, some courts refuse to allow discovery of document retention policies unless the movant first establishes that spoliation is a legitimate issue in the case. In the middle of the spectrum, some courts permit discovery of document retention policies without a showing of spoliation or discovery misconduct, but only in

9

> circumstances where the non-moving party has claimed that requested
> discovery documents are unavailable, or when there are indicia that the
> discovery process was not thorough, reliable, or transparent.

Id. (internal citations and quotation marks omitted). The court went on to find that a showing of spoliation or discovery misconduct is not necessary before requiring production of a party's document retention policies, and "the moving party need only demonstrate that production of the non-moving party's document retention policies would enable it to determine the universe of responsive documents, evaluate the completeness of the existing document production, identify any gaps in document production, and craft targeted discovery requests to efficiently obtain any missing records." Id. (citations omitted). The court concluded, "[a] showing that certain requested documents have been deemed 'unavailable,' or that there are indicia that the discovery process was not thorough, reliable, or transparent, may be sufficient for the moving party to meet its burden."

Here, Spectrum argues the pre-2020 document retention policies are relevant and should be produced because Genotek represented that some emails generated prior to 2008 are unavailable. ECF No. 60 at 5. Specifically, Spectrum points to a statement in the Joint Discovery Report that "DNA Genotek has informed Spectrum that its email servers have archives dating back only to 2008." ECF No. 46-1 at 18. In its opposition, Genotek explains:

> DNA Genotek never represented that it has no emails predating 2008. Rather, it explained that its current servers do not store pre-2008 emails in a readily searchable manner. It is unremarkable that a growing life sciences company would outgrow one email system and start a new email system. DNA Genotek did not destroy all old emails. In fact, DNA Genotek has already produced dozens of emails from before 2008 in this case, including key emails that may be relevant to the conception and reduction to practice of the invention claimed in the '187 patent.
>
> Moreover, Spectrum has not made any particularized claim that DNA Genotek's discovery responses are deficient. Such a claim would not be possible, considering the parties have not even begun formal discovery into emails.

ECF No. 56 at 4 (internal citations to the record omitted). In reply, Spectrum does not dispute these assertions and states that "Spectrum must take Genotek at its word regarding unavailability of emails from before 2008." ECF No. 60 at 5. Based on the above, Spectrum has sufficiently shown that some pre-2008 emails might not be available. It also appears as if the production of Genotek's earlier document retention policies would assist Spectrum in determining the universe of responsive documents, evaluate the completeness of existing or subsequent document production, identify any gaps in document production, and craft targeted discovery requests to efficiently obtain any missing records. Accordingly, Spectrum's Motion to Compel a response to RFP No. 69 is **GRANTED**. The parties shall promptly meet and confer on the timeframe in which Genotek will respond.

### III.   Genotek's Request for Financial Information

In RFP No. 75, Genotek requested "Spectrum's quarterly and annual financial statements (including but not limited to income statements, balance sheets, cash flow statements, profit and loss statements, income register, expense register, and periodic financial statements) since January 1, 2014." ECF No. 51-1 at 7. Spectrum responded:

> Spectrum . . . . objects to this Request to the extent that it seeks documents that are not relevant to any party's claims or defenses, not proportional to the needs of the case, or beyond the scope of this litigation, including for example, because it seeks financial information that is unrelated to the SDNA-1000 or SDNA-2000, and financial information dated prior to April 14, 2020. Spectrum has responded to other document requests seeking financial information relating to the accused SDNA-1000 or SDNA-2000 products. Spectrum further objects to this Request as overly broad and unduly burdensome. Spectrum further objects to this request to the extent it seeks documents containing confidential, proprietary, and/or trade secret information prior to the Court's entry of a Protective Order.
>
> Subject to and without waiving these objections, Spectrum intends to produce responsive, non-privileged sales forecasts and projections, if any, for the SDNA-1000 and SDNA-2000 made after April 14, 2020 by October 18, 2021 or within thirty (30) days after the entry of a Protective Order, whichever is later.

ECF No. 51-4 at 13-14.

Genotek argues that Spectrum's financial statements are relevant and proportional to Genotek's damages calculation because: (1) "[w]hile Spectrum produced sales figures pertaining to the accused products, production of company wide sales information will show the impact of these sales on other associated products;"[3] (2) "company-wide sales figures will show the importance of the accused products to the company as a whole;" (3) "[t]hese standard corporate financial statements are a discrete set of documents that are readily available to Spectrum and would take very little time to collect and produce;" and (4) "the protective order adequately protects its interest in confidentiality." ECF No. 51-1 at 8-9. Genotek further argues that "earlier information is relevant because comparing pre-issuance and pre-infringement company-wide sales data with later data can show how the patented technology drove Spectrum's other sales, which is relevant to the damages analysis." ECF No. 58 at 3.

In opposition, Spectrum argues the request is too broad because: (1) it "encompasses financial statements regarding all of Spectrum's business, including products not at issue in this lawsuit and products wholly unrelated to the accused products;" (2) "[i]t also seeks such expansive financial information for five years before Spectrum even launched the accused products in late 2019, and six to seven years before the asserted patents issued in 2020 and 2021;" (3) Spectrum "noted that it was producing sales and profit information for the accused products;" (4) "Genotek's motion does not simply seek financial statements for products related to the accused products, but insists Genotek is entitled to company-wide financial information without limitation;" and (5) "Genotek failed to identify products or services having a 'functional relationship' with the accused products." ECF No. 55 at 7-8. Spectrum argues "Genotek's unreasonably broad document request – and its insistence that Genotek's in-house counsel be allowed to view Spectrum's most commercially

---

[3] Spectrum states that "[d]uring the meet-and-confer process, Genotek never articulated a purported need for convoyed sales information. The first time Genotek raised convoyed sales was in its opening brief for this motion." ECF No. 55 at 8.

sensitive documents – suggests that Genotek is attempting to gain access to highly sensitive competitive information to assess the financial health of its competition." Id. at 9. Spectrum therefore argue that "[a]t the very least, Genotek's request should be limited in time to a period beginning with the launch of the accused products in late 2019." Id. at 8.

Here, both parties make undisputed points. Spectrum does not dispute that the requested financial statements are standard documents that would be relatively easy to collect and produce, or that the Protective Order issued by this Court on September 21, 2021 adequately protects its interest in confidentiality. Under the Protective Order, Spectrum may designate information as "highly confidential – outside counsel eyes only" if it is "among that considered to be most sensitive by the party, including but not limited to trade secrets or other confidential research, development, financial or other commercial information." ECF 34-1 at 6. Genotek, in turn, does not dispute that it is essentially requesting all of Genotek's financial information, regardless of the relatedness of other products, or that it failed to previously raise its functional relationship argument when it met and conferred with Spectrum about this discovery dispute. Instead, in its reply, Genotek argues it has "articulated a theory of why it needs company-wide financial data to reveal information about Spectrum's related products and services such as its custom packaging services, kits, and other associated products." ECF No. 58 at 2-3.

Based on the above, Genotek's Motion to Compel a response to RFP No. 75 is **GRANTED IN PART** and **DENIED IN PART without prejudice**. Unless otherwise agreed by the parties, Spectrum shall provide quarterly and annual financial statements (including but not limited to income statements, balance sheets, cash flow statements, profit and loss statements, income register, expense register, and periodic financial statements) since January 1, 2018 regarding the products at issue as well as related products and services such as custom packaging services and kits.

## IV.   Genotek's Request for Valuation Information

In RFP No. 80, Genotek requested "documents relating to valuations of Spectrum Solutions, L.L.C., Spectrum Packaging, L.L.C., Spectrum Buyer, L.L.C., and Spectrum

Intermediate, L.L.C." ECF No. 51-1 at 10. Spectrum responded:

> Spectrum further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, work product doctrine, or any other applicable privilege or immunity. Spectrum will log privileged documents, if any, dated prior to the filing of the Complaint in this case. Spectrum further objects to this Request as overly broad, unduly burdensome, and oppressive to the extent it calls for production of all documents related to a broad category. Spectrum will not produce any documents where the burden to Spectrum to collect, review and produce is not proportional to the needs of the case. Spectrum further objects to this Request to the extent that it seeks documents that are not relevant to any party's claims or defenses, not proportional to the needs of the case, or beyond the scope of this litigation. Spectrum further objects to this Request to the extent that it seeks documents that are not relevant to any party's claims or defenses, not proportional to the needs of the case, or beyond the scope of this litigation, including for example, valuations made prior to April 14, 2020. Spectrum further objects to this request to the extent it seeks documents containing confidential, proprietary, and/or trade secret information prior to the Court's entry of a Protective Order.

ECF No. 51-4 at 14–15.

Genotek argues: (1) "boilerplate objections provide no valid basis for Spectrum to withhold documents;" (2) "[t]his information will be valuable to DNA Genotek's calculation of damages in this case; and (3) "Spectrum's valuation is also relevant to DNA Genotek's defense against Spectrum's antitrust counterclaims . . . . [because] . . . . "[i]f Spectrum's valuation has increased in recent years, then Spectrum may not be suffering the anticompetitive harm that it so claims." ECF No. 51-1 at 10–11.

In opposition, Spectrum argues: (1) "the accused products are not Spectrum's only product line, and Genotek has failed to show otherwise;" (2) "Genotek offers no explanation, and provides no support, for the purported relevance of valuations of Spectrum's affiliate companies to Genotek's damages analysis;" and (3) "Genotek never explains why a valuation of Spectrum as a whole – much less the valuations of Spectrum's affiliates – will shed any light on Spectrum's market share, ability to compete, or anticompetitive harm in the specific alleged antitrust market, i.e., the market for clinical whole saliva genetic test kits." ECF No. 55 at 10.

Here, Genotek provides some support for its argument that valuation information is relevant to damages. In <u>Symantec Corp. v. Zscaler, Inc.</u>, Case No. 17-cv-04426-JST (TSH), 2019 WL 2288278, at *2 (N.D. Cal. May 29, 2019), the court found that although it is not a "straight shot" from product valuation to patent infringement damages, "the valuation of an accused product (and even more so the valuation of [the] company) includes the value of the non-infringing aspects as well . . . . and these valuations meet [the relevance] standard because they are an important input to the computation of damages." Additionally, Spectrum does not meaningfully dispute Genotek's argument that the valuation information is relevant to defend against Spectrum's antitrust claim, which serves as an additional reason to compel the production of the requested documents. Spectrum also does not dispute that the Protective Order can adequately protect the confidentiality of the information. In its Reply, however, Genotek does not explain the relevance of its request for information on the value of Spectrum's affiliate companies. <u>See</u> ECF No. 58.

Accordingly, Genotek's Motion to Compel a response to RFP No. 80 is **GRANTED IN PART** and **DENIED IN PART without prejudice**. Spectrum shall provide documents relating to valuations of Spectrum Solutions, L.L.C., but to the extent the information can be reasonably separated, Spectrum does not need to provide documents relating to valuations of Spectrum's affiliate companies including Spectrum Packaging, L.L.C., Spectrum Buyer, L.L.C., and Spectrum Intermediate, L.L.C." The parties shall promptly meet and confer on the timeframe in which Spectrum will respond.

## V. Genotek's Request for Manufacturing and Labeling Information

In RFP Nos. 9, 69, 70, and 73, Genotek requested documents: (1) "relating to and/or identifying the country of origin of each and every ingredient, component, and material used in the manufacture of the accused products;" (2) "concerning the labeling of the country of origin or manufacture of the accused products;" (3) "concerning the advertising of any of the accused products as made, manufactured, or assembled in a particular geographic location;" and (4) "concerning the design of the label of the accused products." ECF No. 51-1 at 12. Spectrum objected on the grounds of undue burden, over breadth,

15

21cv516-DMS-LL

oppression, and relevance. ECF No. 51-4 at 20–25.

In its motion, Genotek argues that "Spectrum should be required to produce information about where it makes its products, especially in light of its documented history of making false claims about this topic." ECF No. 51-1 at 11. In support of this argument, Genotek cites previous testimony from Spectrum's co-founder indicating that an "old device" that was labeled as "Made in the USA" was actually made in Malaysia. Id. at 11–12. Spectrum includes pictures comparing the packaging from the old product to an accused product, both of which appear similar, and argues that the accused products "make the same claim as the fraudulently advertised products." Id. at 14. Genotek also cites a five-part standard applied in Davidson Pipe Co. v. Laventhol & Horwath, 120 F.R.D. 455, 462–63 (S.D.N.Y. 1988) for determining whether discovery of information related to possible impeachment should be allowed.

In opposition, Spectrum argues (1) there is no "history of making false claims" because Genotek points to no ruling or decision finding that Spectrum made any false claims, and the testimony is from a prior case in Delaware between Genotek and Spectrum regarding a different Spectrum product that Spectrum no longer manufactures;" (2) Genotek "has everything it needs regarding the alleged prior acts" of alleged misrepresentations; and (3) "even if the country of manufacture were relevant, . . . Spectrum labels the accused products as made in Malaysia, Mexico, and the United States." ECF No. 55 at 13–14. Spectrum does not, however, dispute that discovery for impeachment purposes can be generally valid, or that discovery regarding the accuracy of the label for the accused products might reasonably lead to admissible evidence for impeachment purposes. The evidence put forth by Genotek is sufficient, at this stage, to allow for discovery regarding the accuracy of any "Made in the USA" label for the accused products for impeachment purposes. It is not for Spectrum to decide whether Genotek has all it needs for this purpose, and the fact that the accused products are labeled as being manufactured in a particular country does not confirm the label's accuracy.

Spectrum focuses most of its remaining argument on the lack of relevance between

the accuracy of the labels on the accused products to Genotek's infringement claim. Id. at 11–14. As pointed out by Genotek, however, its direct patent infringement claim requires it to show the accused products were sold or otherwise made "within the United States" or were "import[ed] into the United States." 35 U.S.C. § 271(a). Accordingly, to this end, there is a least some minimal additional relevancy in obtaining discovery regarding the products' country of origin. Regardless, Spectrum does not argue that a different standard than the one identified by Genotek should apply, and Spectrum cites no comparable cases supporting its position.[4] Accordingly, Genotek's Motion to Compel a response to RFP Nos. 9, 69, 70, and 73 is **GRANTED**. The parties shall promptly meet and confer on the timeframe in which Spectrum will respond.

## CONCLUSION

For the foregoing reasons, Spectrum's Motion to Compel responses to RFP Nos. 24, 25, 26, 27, and 34 is **GRANTED**. Spectrum's Motion to Compel a response to RFP No. 69 is **GRANTED**. Genotek's Motion to Compel a response to RFP No. 75 is **GRANTED IN PART** and **DENIED IN PART without prejudice** as discussed above. Genotek's Motion to Compel a response to RFP No. 80 is **GRANTED IN PART** and **DENIED IN PART without prejudice** as discussed above. Genotek's Motion to Compel a response to RFP Nos. 9, 69, 70, and 73 is **GRANTED**.

**IT IS SO ORDERED**.

Dated:  December 14, 2021

Honorable Linda Lopez
United States Magistrate Judge

---

[4] Genotek also argues that the location of Spectrum's manufacturing is relevant to damages because "[w]hether Spectrum does in fact make its products in the United States could have an impact on its costs and profits." ECF No. 51-1 at 15.