BRIAN M. KRAMER (CA SBN 212107)
BMKramer@mofo.com
JOHN R. LANHAM (CA SBN 289382)
JLanham@mofo.com
DREW A. HILLIER (CA SBN 337112)
DHillier@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, California 92130-2040
Telephone: 858.720.5100
Facsimile: 858.720.5125

DAVID D. CROSS (*pro hac vice*)
DCross@mofo.com
MORRISON & FOERSTER LLP
2100 L. Street, NW Suite 900
Washington, DC 20037
Telephone: 202.887.1500
Facsimile: 202.887.0763

Attorneys for Plaintiff
DNA GENOTEK INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DNA GENOTEK INC., a Canadian Corporation, <br><br> Plaintiff, <br><br> v. <br><br> SPECTRUM SOLUTIONS L.L.C., a Utah Limited Liability Company, <br><br> Defendant. <br><br> AND RELATED COUNTERCLAIMS | Case No. 3:21-cv-0516-RSH-DDL <br><br> **DNA GENOTEK INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO SPECTRUM SOLUTIONS L.L.C.'S MOTION FOR LEAVE TO AMEND COUNTERCLAIM** <br><br> Hon. Robert S. Huie <br> Hon. David D. Leshner <br><br> **DEMAND FOR JURY TRIAL** <br><br> **REDACTED VERSION OF DOCUMENT SUBMITTED FOR FILING UNDER SEAL** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   FACTUAL BACKGROUND ............................................... 3

    A.    Spectrum Filed a Knowingly Inaccurate Counterclaim ...................... 3

    B.    Genotek Moved to Dismiss Spectrum's Counterclaim. ...................... 4

    C.    Discovery Revealed Spectrum's Deception In Its Counterclaim. ........ 5

    D.    Spectrum Moves to Supplement Its Sanctionable Counterclaim. ........ 9

    E.    Spectrum Moves To Amend Its Counterclaim, But Repeats And Asserts New Sanctionable Allegations. ................................................. 9

III.   LEGAL STANDARD ....................................................... 10

IV.   ARGUMENT ................................................................... 11

    A.    Spectrum's Motion Should Be Denied For Futility ......................... 11

        1.    Spectrum's New Inequitable Conduct Allegations are Futile. ............................................................................ 11

        2.    Spectrum Cannot Adequately Plead Other Elements of Its Walker Process Attempted Monopolization Claim Either. ...... 17

    B.    Spectrum's Amendments Are Unduly Prejudicial. .......................... 21

    C.    Spectrum's Motion Is Untimely ..................................................... 22

    D.    Spectrum's Motion Was Brought in Bad Faith. ............................. 25

ny-2555356

**Cases**

*Ahlmeyer v. Nevada Sys. of Higher Educ.,*
    555 F.3d 1051 (9th Cir. 2009)................................................................11

*AmerisourceBergen Corp. v. Dialysist West, Inc.,*
    465 F.3d 946 (9th Cir. 2006)................................................................22

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.,*
    2020 WL 58247 (S.D.N.Y. Jan. 6, 2020)............................................20

*Ascon Props., Inc. v. Mobil Oil Co.,*
    866 F.2d 1149 (9th Cir.1989)...............................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 545 (2007) .............................................................................11

*California Costume Collections, Inc. v. Pandaloon, LLC,*
    2022 WL 1062056 (C.D. Cal. Apr. 7, 2022)...............................15, 17

*Columbia Pictures Indus. v. Prof'l Real Estate Investors, Inc.,*
    944 F.2d 1525 (9th Cir. 1991) .............................................................12

*Deauville Corp. v. Federated Dept. Stores, Inc.,*
    756 F. 2d 1183 (5th Cir. 1985).............................................................21

*Delphix Corp. v. Actifo, Inc.,*
    2014 WL 4628490 (N.D. Cal. Mar. 19, 2014)....................................22

*E&E Co. v. London Luxury LLC,*
    571 F. Supp. 3d 64 (S.D.N.Y. 2021) ...................................................12

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
    575 F.3d 1312 (Fed. Cir. 2009) ............................................12, 13, 16

*Johnson v. Am. Airlines, Inc.,*
    834 F.2d 721 (9th Cir. 1987) ...............................................................12

*McGlinchy v. Shell Chemical Co.,*
    845 F.2d 802 (9th Cir. 1988) .......................................................19, 21

ny-2555356

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    13 F. Supp. 3d 1116 (D. Or. 2014) ................................................................... 14

*Merna v. Cottman Transmission Systems, LLC.*,
    2005 WL 8173859 (W.D. Wa. Dec. 16, 2005) .................................................. 11

*Miller v. Rykoff-Sexton, Inc.*,
    845 F.2d 209 (9th Cir. 1988) ............................................................................. 11

*Mountain Lakes House of Prayer v. Guideone Specialty Mut. Ins. Co.*,
    2019 WL 932032 (E.D. Ca. Feb. 26, 2019) ....................................................... 11

*Multiflex, Inc. v. Samuel Moore & Co.*,
    709 F. 2d 980 (5th Cir. 1983) ............................................................................ 20

*ParkerVision, Inc. v. Qualcomm Inc.*,
    924 F. Supp. 2d 1314 (M.D. Fla. 2013) ............................................................ 17

*Patton v. Loadholt*,
    2023 WL 2480724, (E.D. Cal. Mar. 13, 2023) .................................................. 25

*Patton v. Loadholt*,
    2022 WL 17555496 (E.D. Cal. Dec. 9, 2022) ................................................... 25

*Rambus, Inc. v. STMicroelectronics N.V.*,
    2013 WL 12343708 (N.D. Cal. Mar. 18, 2013) ................................................ 13

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................. 18

*In re Ronco, Inc.*,
    838 F.2d 212 (7th Cir. 1988) ............................................................................. 11

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
    817 F. Supp. 2d 418 (D. Del. 2011) .................................................................. 11

*Techshell, Inc. v. Max Interactive, Inc.*,
    2019 WL 4422682 (C.D. Cal. Aug. 5, 2019) .................................................... 17

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) ........................................................................ 13

*TransWeb, LLC v. 3M Innovative Properties Co.*,
    16 F.Supp.3d 385 (D.N.J. 2014) ................................................................ 19, 21

*TransWeb, LLC v. 3M Innovative Props. Co.*,
812 F.3d 1295 (Fed. Cir. 2016) ....................................................................... 19, 20

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013) .............................................................................. 10

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
2015 WL 9948723 (C.D. Cal. Dec. 7, 2015)....................................................... 19

**Rules and Regulations**

37 C.F.R. § 1.56(b) ................................................................................................ 17

FED. R. CIV. P. 9(b) .......................................................................................... 12, 13

FED. R. CIV. P. 11, 1993 Adv. Comm. Notes ....................................................... 12

FED. R. CIV. P. 11(c)(2)....................................................................................2, 10

FED. R. CIV. P. 11(c)(3).......................................................................................... 10

FED. R. CIV. P. 12(b)(6) .......................................................................................... 11

FED. R. CIV. P. 15(a) .......................................................................................... 10, 25

iv

# I.    INTRODUCTION

Spectrum's Motion to Amend its Counterclaim fails for several reasons: (i) it's futile because it asserts meritless claims (and violates Spectrum's and its counsel's duties under Rule 11); (ii) it's prejudicial to Genotek; (iii) it's extremely untimely; and (iv) it's brought in bad faith.

In August 2021, Spectrum asserted retaliatory counterclaims against Genotek. Spectrum accused Genotek of inequitable conduct in the procurement of the '187 patent and of violating Section 2 of the Sherman Act by allegedly monopolizing or attempting to monopolize a gerrymandered market it calls the "clinical whole saliva genetic test kit market." Then-presiding District Judge Jinsook Ohta voiced doubts about the adequacy of Spectrum's "vague" and "general" allegations, but ultimately allowed them to proceed as to a clinical whole saliva genetic test kit market for COVID-19 sales, because she was obligated to accept Spectrum's allegations as true. Discovery has revealed the allegations to be knowingly untrue.

Spectrum cast itself as a small, struggling victim of anticompetitive conduct by Genotek. It willfully omitted and misstated its tremendous, enduring success competing against Genotek when it filed in August 2021. Contrary to its allegation that "Genotek is by far the largest competitor in this market, followed by Spectrum," Spectrum internally celebrated its meteoric success as the "[m]arket leader for sample collection," claiming it "won the lionshare of the market" with "a sustainable position" that was "orders of magnitude ahead of [Genotek]." Contrary to its allegation that "Genotek's anticompetitive conduct has caused Spectrum to lose customers, investors, and opportunities that would have otherwise been available," Spectrum and its economic expert Dr. Bradley Reiff were unable to identify any such losses; and its witnesses identified no customers that were *unable* to buy the SDNA product because of a Genotek contract, much less enough customers to substantially foreclose Spectrum from the market, which obviously didn't occur. In fact, Spectrum omitted that it dramatically increased its SDNA production during the pandemic, *sold*

*every SDNA unit it could possibly manufacture*, and turned away numerous prospective buyers for lack of supply. And contrary to its allegation that Genotek controls prices, Spectrum omitted that *its own SDNA prices* were substantially higher than Genotek's prices for competing sales and that Spectrum's Head of Sales emphasized that "'the invisible hand of competition' will set the market price" and that "Spectrum is well poised via their high margins to play in any market regardless of market price. While still maintaining high margins." Spectrum willfully misled this Court with knowingly untrue allegations to try to gain a tactical advantage in the litigation. Had the Court known the truth, its antitrust claims could not have survived.

Spectrum claims it seeks to amend its Counterclaim because of information obtained from Genotek. This is highly misleading. On March 24, 2023, as Spectrum discloses in its Motion, Genotek served Spectrum with a sanctions motion under Rule 11(c)(2) after it refused to dismiss its antitrust claims voluntarily. Genotek showed that pivotal allegations in Spectrum's Counterclaim were knowingly untrue *when made based on the facts already known to Spectrum at that time*. Although Spectrum and its counsel were duty-bound to dismiss both antitrust claims and not to persist with false allegations, they chose to double-down, embroiling the parties and the Court in still more motion practice by filing this Motion, which persists with knowingly inaccurate allegations (and by persisting with a separate Motion to Supplement the current Counterclaim that this Motion seeks to replace).

Even putting aside the impropriety of Spectrum's and its counsel's conduct, Spectrum's amendment is futile. It now admits that its monopolization claim must be dismissed. Its other counterclaims likewise fail. *First*, it asserts a new theory for its inequitable conduct claim and admits that it lacks supporting evidence for that theory by pleading it "upon information and belief." Spectrum has no good faith belief that it will obtain supporting evidence for those allegations given fact discovery closed months ago. *Second*, despite persisting with the false depiction of itself as a struggling competitor, Spectrum cannot establish that Genotek has a dangerous

probability of gaining monopoly power in a relevant antitrust market, a critical element of its attempted monopolization claim. Moreover, Spectrum and Dr. Reiff admit there is no harm to competition here, which also is fatal to its antitrust claims.

Spectrum's very-belated Motion is also highly prejudicial to Genotek. Again, Spectrum asserts a new theory of inequitable conduct (for which it admits it lacks evidence) and it asserts numerous materially different antitrust allegations (while persisting with other inaccurate allegations). Requiring Genotek to respond to this Amended Counterclaim when the parties are supposed to be finishing expert discovery and preparing pre-trial motions imposes undue cost and distraction on Genotek and should not be allowed. It would be especially prejudicial to re-open discovery at this very late stage, which should not be allowed.

Spectrum's Motion is extremely untimely. Spectrum has known since it filed its Counterclaim nearly two years ago that it asserted inaccurate allegations. Rather than promptly withdraw, or at least correct, that improper pleading when discovery revealed these inaccuracies, Spectrum and its counsel persisted with it. They filed this Motion only because they faced Genotek's sanctions motion for their misconduct. But even if proper, this Motion comes far too late, and the Court should not reward and encourage such egregious misconduct by allowing the amendments.

Finally, Spectrum's bad faith in burdening the Court and Genotek with *both* this Motion and its now-rejected Motion to Supplement [its] Counterclaim—rather than filing a single Motion with a complete amended pleading, as is required—further justifies denying this Motion.[1]

## II.     FACTUAL BACKGROUND

### A.     Spectrum Filed a Knowingly Inaccurate Counterclaim.

On August 18, 2021, Spectrum asserted counterclaims for alleged inequitable conduct regarding the '187 patent (Dkt. 27, ¶¶ 133-136) and violations of § 2 of the Sherman Act for *Walker Process* monopolization (*id.*, ¶¶ 137-144) and attempted

---

[1] The Court denied Spectrum's Motion to Supplement on May 2, 2023 (Dkt. 316).

monopolization (*id.*, ¶¶ 145-152) claims based on the alleged inequitable conduct.

Spectrum claimed that Genotek failed to disclose foreign office actions originally submitted in the "Birnboim III" patent prosecution during its later prosecution of the "Birnboim I" patents. Spectrum refers to Birnboim I as any patent or application related to Canadian PCT Patent App. No. PCT CA/2003/104251, an international patent application that shares a similar specification and the same priority documents as the '187 patent. (*See id.*, ¶¶ 82-84; Dkt. 27-1.) Spectrum refers to Birnboim III as any patent or application related to Canadian PCT Patent App. No. PCT CA/2007/001785, which led to the '795 patent. (*See* Dkt. 27, ¶¶ 83-84; Dkt. 27-11.)

Spectrum's inequitable conduct allegations painted Boston attorney, James Velema, as the deceptive worldwide mastermind behind the prosecution of the Birnboim I and III patent families. Spectrum's theory included false allegations about Velema's role as U.S. patent counsel for Genotek, including his purported role as counsel for the '116 patent. (*See* Dkt. 27, ¶¶ 117-124.) This assertion was demonstrably untrue. As Spectrum has admitted, Velema never served as counsel for the '116 patent. (*See* Dkt. 76, at 5 n.3.) Nonetheless, Spectrum left all allegations against Velema on the docket from August 2021 to the filing of this motion, forcing Velema to stand as an accused fraudster for over 18 months.

Spectrum's remaining allegations for its antitrust claims rely on three critical assertions: (i) Genotek had a dominant share of the relevant market and controls prices; (ii) that dominance was protected by high barriers to entry and expansion; and (iii) its assertion of the '187 patent harmed competition in the market and caused Spectrum to lose customers. Spectrum knew this was untrue when it filed.

### B. Genotek Moved to Dismiss Spectrum's Counterclaim.

Genotek moved to dismiss Spectrum's Counterclaim on October 14, 2021. (Dkt. 41.) Among other things, Genotek pointed out that Spectrum did "not have enough evidence to paint Velema as the deceptive worldwide mastermind it needs

for its inequitable conduct theory to have any legs" (*id.* at 13); and that Spectrum's monopoly power showing rested on the "conclusory, speculative allegation that Genotek's market share in 2019 'was greater than at least 65% and by Spectrum's estimates may have approached 80-85%'" (*id.* at 21 n.7 (quoting Dkt. 27, ¶¶ 9, 93)).

On March 30, 2022, the Court heard oral argument on Genotek's motion (Dkt. 110). After expressing concerns specifically about Spectrum's antitrust counterclaims, Judge Ohta devoted much of the hearing to the outcome-determinative issue of whether the parties face significant competition from third parties, pressing Spectrum's counsel for clarity on this issue. (*See* Ex. A,[2] at 36:6-37:17; 38:6-44:12.) Spectrum's counsel represented—without any evidentiary basis and contrary, as discovery has shown, to the facts known to Spectrum and confirmed by Dr. Reiff—that Genotek and Spectrum "are the only major players, only competitors," and that "there's other very small players, *potentially*." (*Id.* at 42:23-43:21 (emphasis added).)

In denying Genotek's motion to dismiss, Judge Ohta noted she was required to accept Spectrum's allegations as true (*id.*), including "that the only two significant players in the market are Spectrum and Genotek." (*Id.* at 49:22-24.) As discovery revealed, that was unsupported and untrue, with other robust competitors controlling nearly 20% of the market, per Dr. Reiff. Judge Ohta also found Spectrum's allegations sufficient to define the relevant market as whole saliva collection kits *specifically for COVID-19 testing*.[3] (*Id.* at 49:19-22.) As shown below, Spectrum saw itself as the "leader" in that market *when it filed its Counterclaim*.

## C. Discovery Revealed Spectrum's Deception In Its Counterclaim.

Discovery revealed Spectrum's Counterclaim allegations to be knowingly

---

[2] Exhibits A-Y refer to exhibits attached to the Declaration of Brian M. Kramer ("Kramer Decl.") filed concurrently herewith.

[3] Spectrum has ignored this ruling, without objecting or seeking reconsideration, and insisted on a much broader market, including in its proposed Amended Counterclaim—notwithstanding that it admits it did not compete for *non*-COVID sales until recent months and *could not* compete for sales in the broader market needing 510(k) approval by the FDA. (*See, e.g.*, Ex. B, at 47:19-50: 22.)

untrue and unsupported when filed in 2021. Spectrum wrongly cast itself as a small, struggling victim, while celebrating the truth of its success internally and with others.

Spectrum burst into its alleged market at the start of 2020, quickly claiming a massive share through SDNA sales for COVID-19 testing, as it was the first whole saliva test kit to receive an Emergency Use Authorization (EUA) from the FDA for that testing. (Dkt. 27, ¶ 95; Dkt. 296-7, at '922.) By November 2020, Spectrum broadly recognized itself as the "[m]arket leader for sample collection" and touted its "[s]trong commercial traction" regarding the success of its SDNA products, including its "[m]arket leadership and first-mover advantage for saliva collection for COVID testing." (Dkt. 296-7, at '922, '927.) In February 2021, in response to "diligence questions" from a potential merger partner, Spectrum's then-Head of Sales, Tony Cianflone, emphasized that "'the invisible hand of competition' will set the market price" and that "Spectrum is well poised via their high margins to play in any market regardless of market price [w]hile still maintaining high margins." (Dkt. 296-9 at '024.)

At the same time, Spectrum's consultants at JP Morgan corresponded with its senior executives about how to respond to an inquiry from a possible merger partner regarding Spectrum's business, including specifically competition with Genotek:

> They want to understand our view of the technology differentiation between our product and [*Genotek's*].... I would also emphasize here that we feel like we have been *far faster out of the gate and have won the lionshare of the market ahead of them and have a sustainable position*. Based on our visibility into their numbers *we are orders of magnitude ahead of them*.
>
> &ast;      &ast;      &ast;
>
> *We have recently won and are in the process of signing some very sizeable contracts.... [W]e expect our revenue this year will be orders of magnitude larger than our Q4 run-rate. We are also very profitable.*

(Dkt. 296-8, at '396-397 (emphasis added).) Spectrum's CEO, Steve Fanning, who was part of this correspondence, testified that the SDNA products' success was like that of *over-the-counter Tylenol*®. (Ex. C, at 81:7-82:5.)

Spectrum's own economic expert, Dr. Reiff, confirmed Spectrum's great

success competing in the marketplace.[4] (Ex. B, at 97:8-13.) Dr. Reiff's report identified 2020 market shares of ██ for Spectrum and only ██ for Genotek in the relevant market for COVID-19 testing. (Ex. E, at Ex. 9.) For 2021, when Spectrum filed its Counterclaim, he reported that Spectrum still held ██ of that market while Genotek had only ██ (*Id.*) His calculations for 2022—when Spectrum opposed Genotek's Motion to Dismiss and doubled down on its untrue allegations—are even worse: he found that Spectrum controlled a whopping ██ of the relevant market for COVID-19 testing, with Genotek down to only ██ (*Id.*) Indeed, Dr. Reiff found that Genotek has had no monopoly power since *long before* Spectrum filed its August 2021 Counterclaim (*id.* ¶ 94), when Spectrum itself already celebrated its position as the "[m]arket leader for sample collection" (Dkt. 296-7, at '922).[5] And Spectrum's corporate deponent was unable to provide factual support for its allegations, including its critical market share numbers. (Dkt. 296-3, at 65:8-67:3; 96:7-18, 129:7-130:12.) He testified that Spectrum relied on its counsel for its factual allegations—which of course is *backwards*. (*Id.* at 96:7-18.)

Dr. Reiff also confirmed the fallacy of Spectrum's Counterclaim allegation that Genotek's market share "dwarfed" that of "the small number of remaining competitors" apart from Spectrum. (Dkt. 27, ¶ 92.) He reported that (i) *nearly* ██ of the market in 2021 was controlled by third-party competitors, with Genotek at only ██ share; and (ii) nearly the entirety of the share Spectrum lost from 2020 to 2021 went to competitors *other than Genotek*, given Spectrum lost █ percentage points in

---

[4] On May 5, 2022, early in discovery, Spectrum disclosed Dr. Reiff as its economic expert. (*See* Ex. D.) It persisted with its claims despite his findings.
[5] Spectrum's Counterclaim fares no better with a broader relevant market than COVID-19 testing (which, again, is essentially the only purpose for which Spectrum sold its SDNA ███ duct until just rece ███), with Dr. Reiff providi ███ he following mark ███ hares: ██ for Genotek an ██ for Spectrum ██ 020; ██ for Genotek and ██ for Sp ███ um in 2021; and ██ or Genotek and ██ for S ███ trum in 2022. (Ex. ███ t Ex. 6.) These findings re ███ the shares Spectr ███ and its counsel alleged in its Counterclaim and dispel any plausible notion of monopoly power when Spectrum filed its Counterclaim, or even long before then or after.

share while Genotek gained only ▮ percentage point.[6]  (Ex. E, at Ex. 9.)

Spectrum was so successful, even as a new entrant in the relevant market it alleges, that it immediately and dramatically increased its production capacity shortly after receiving its EUA in early 2020.  (Ex. F, at 77:5-25, 78:21-79:19, 292:5-293:10.)  It even engaged third-party manufacturers to help produce its SDNA product.  (*Id.* at 316:10-320:10, 292:5-293:10.)  Importantly, *Spectrum sold every single SDNA unit it could possibly manufacture* throughout the height of the pandemic, amounting to more than ▮▮▮▮ units between April 2020 and March 2022 *alone*.  (*See* Ex. T, at 41 (Ex. 3); Ex. G at '558; Ex. H, at '105.)  Spectrum commanded "high margins" on those sales, reaching ▮ in 2020.  (*See* Dkt. 296-9 at '024; Ex. I, at '864.)  None of this appears in its current *or Amended Counterclaim*, which is highly misleading.

Spectrum's Counterclaim also repeatedly alleged that Genotek "control[s] prices" in the market, which it has "repeatedly and significantly increased over time." (Dkt. 27 ¶¶ 96-99, 106-09.)  But Spectrum's SDNA prices have long been *substantially higher* than Genotek's prices for competing sales (*i.e.*, COVID-19 testing, which are the only sales Spectrum had pursued at the time of its Counterclaim).  (Ex. B, at 50:17-22.)  And neither Spectrum nor Dr. Reiff has shown repeated, significant increases in Genotek prices over time, despite having Genotek's pricing back to 2014—which actually shows *declining* prices over time.

In short, Spectrum knew when it filed its Counterclaim that there was no good faith basis for the pivotal allegations underlying its claims, including the critical allegations that "Genotek's conduct *has* and will cause substantial harm to competition and to consumers" and that "Spectrum *has* suffered antitrust injury." (Dkt. 27, ¶¶ 106, 112 (emphasis added).)  Dr. Reiff expressly rejected these allegations, which are essential for Spectrum's antitrust claims (*see infra* IV.A.2.)—

---

[6] On the last day of fact discovery, Spectrum denied *its own* market share allegations (*compare* Ex. J at 4, *with* Dkt. 27 ¶ 93), while repeating those *same market share allegations* in its interrogatory response (*see* Ex. K, at 12:19-26.)

yet still it persists.

**D.    Spectrum Moves to Supplement Its Sanctionable Counterclaim.**

On February 2, 2023—the eve of serving Dr. Reiff's report—Spectrum notified Genotek that it would abandon its monopolization claim and seek to supplement its Counterclaim with new allegations supposedly supporting its attempted monopolization claim.  (Dkt. 267-6, at 9.)  In response, counsel for Genotek pointed out that Spectrum's "initiation and continued pursuit of any of the antitrust counterclaims violates Spectrum's and its counsel's duties in a variety of respects, including under Rule 11" and asked Spectrum to dismiss its monopolization claim with prejudice. (*Id.* at 8.)  Spectrum refused. (*Id.* at 7.)  On February 26, 2023, counsel for Genotek repeated its request, pointing out that keeping the claim in the case "create[s] uncertainty and risk" and "impose[s] unnecessary burden and expense on [Genotek] and the Court because at the very least [Genotek] would be required to move to dismiss it ourselves." (*Id.* at 6.)  Spectrum again refused (*id.* at 4.)*,* and filed its motion to supplement on March 17, 2023, thereby doubling down on its untrue allegations by seeking to supplement them.  (Dkt. 267-1 at 1, 2, 8.)

**E.    Spectrum Moves To Amend Its Counterclaim, But Repeats And Asserts New Sanctionable Allegations.**

On March 30, 2023, a week after Genotek served it with a sanctions motion (*see* Mot. at 2), Spectrum notified Genotek that it intended to amend its Counterclaim. (*See* Dkt. 296-5, at 6.)  Genotek repeatedly asked Spectrum to combine its motions to supplement and amend its Counterclaim to streamline the issues, minimize cost and burden for the parties and the Court, and avoid confusion.  (*Id.* at 2, 5; Dkt. 308 at 3.)  Spectrum refused (Dkt. 308 at 3), filing this motion on April 11, 2023.

Spectrum's amendment fundamentally alters the allegations underlying its inequitable conduct claim, conceding the inaccuracy of its original Counterclaim. Spectrum's new allegations center on Canadian patent agents at Osler, Hoskin & Harcourt LLP during the U.S. prosecution of the Birnboim I family.  Unable to

pinpoint a specific alleged perpetrator, Spectrum now accuses (and attacks the professional integrity of) an indefinite cast of characters—Dr. Adele Jackson *and* the so-called "Osler Agents," which includes "at least David Barrans, and Nicole Dinaut"—of committing inequitable conduct, rather than Velema (Am. Countercl., 63) (the victim of Spectrum's admittedly-untrue public attack for nearly two years).

Spectrum also abandons its monopolization counterclaim. While it concedes the inaccuracy of pivotal allegations via amendments, its Amended Counterclaim remains rife with untrue and misleading allegations contradicted by its own internal documents and statements, including, *e.g.*: (i) the market "is concentrated in a limited number of potential customers," which Genotek has tried "to lock . . . into de-facto long term contracts"; (ii) "Genotek's conduct has and will cause substantial harm to competition and, as a result, to consumers"; (iii) "Genotek's anticompetitive conduct has caused Spectrum to lose customers"; and (iv) "Precluding Genotek's anticompetitive behavior will open up the clinical whole saliva genetic test kit market, allowing Spectrum and other competitors or potential competitors to compete fairly against Genotek" (*id.* ¶¶ 97, 106, 110, 114). Spectrum continues to omit that it and other competitors have competed very successfully in that alleged market.

### III. LEGAL STANDARD

Leave to amend under Rule 15(a) "is not to be granted automatically." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013) (internal quotation marks and citation omitted). Courts consider five factors: "(1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has previously amended his complaint." *Id.* (internal quotation marks omitted). The first four factors weigh strongly against Spectrum's Motion. It also violates Rule 11.[7] It persists with and expands on

---

[7] The 21-day period under Rule 11(c)(2) ended on April 14, 2023. Instead of dismissing its counterclaims, Spectrum dodged the motion by doubling down and expanding on its untrue allegations in this motion. Rather than waiting for a new Rule 11 motion from Genotek, the Court also can impose sanctions on its own initiative. *See* Fed. R. Civ. P. 11(c)(3).

knowingly untrue and unsupported allegations, both expressly and by omission.[8]

Spectrum's Motion should be denied.[9]

## IV. ARGUMENT

### A. Spectrum's Motion Should Be Denied For Futility.

A proposed amendment is futile if it cannot withstand dismissal. *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). To satisfy this standard, factual allegations must "raise a right to relief above the speculative level" such that the claim "is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 545, 555, 570 (2007). "[F]utility of amendment alone can justify the denial of a motion." *Ahlmeyer v. Nevada Sys. of Higher Educ.*, 555 F.3d 1051, 1055 (9th Cir. 2009).

#### 1. Spectrum's New Inequitable Conduct Allegations are Futile.

*First*, Spectrum's new allegations are futile because it makes them almost entirely on "information and belief." It now accuses "at least" three individuals—Dr. Adele Jackson, David Barrans, and Nicole Dinaut—of inequitable conduct, but hedges its conclusory statements about what they supposedly did with the caveat "upon information and belief," indicating it lacks evidence. (Am. Countercl., ¶¶ 63-65, 68, 74-79, 101.) But fact discovery closed months ago; thus, Spectrum has no more opportunity to substantiate pivotal allegations in its Amended Counterclaim,

---

[8] *See Mountain Lakes House of Prayer v. Guideone Specialty Mutual Insurance Co.*, 2019 WL 932032, at *2-3 (E.D. Ca. Feb. 26, 2019); *Merna v. Cottman Transmission Systems, LLC.*, 2005 WL 8173859, at *6 (W.D. Wa. Dec. 16, 2005) (citing *In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) ("An omission may be equally as misleading as a false declarative statement."). In *In re Ronco*, the court explained: "While the appellant did not misstate an empirical fact, it did omit facts that were highly relevant to an accurate characterization of the facts that were stated. Such an obvious omission placed a heavy burden on the court. The presentation amounts, in its totality, to a half-truth that can be just as misleading, sometimes more misleading, than an absolutely false representation." 838 F.2d at 218. In *Mountain Lakes*, the court emphasized that "Plaintiff essentially asks the Court to sanction a procedure by which a pleading party can survive a Rule 12(b)(6) motion as long as the party is willing to lie to the Court by omission." 2019 WL 932032, at *3. This is exactly what Spectrum has done and is still doing.

[9] *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 817 F. Supp. 2d 418, 423 (D. Del. 2011) (denying motion to amend where chronology showed "inequitable conduct was an ace in the hole to be used if . . . other attempts to avoid liability in this case failed").

and the deadline for summary judgment motions is fast-approaching.[10]  Spectrum's

new inequitable conduct allegations should be rejected as futile on this basis alone.

*See Johnson v. Am. Airlines, Inc.,* 834 F.2d 721, 724 (9th Cir. 1987) ("[F]utility

includes the inevitability of a claim's defeat on summary judgment").[11]

*Second,* Spectrum's amendments fail to meet the particularity requirement of

Rule 9(b).  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir.

2009) ("the pleading must identify the specific who, what, when, where, and how of

the material misrepresentation or omission committed before the PTO").  Spectrum's

Counterclaim survived dismissal because it falsely accused a specific individual

(Velema) of inequitable conduct, and Judge Ohta concluded she was obligated to

accept the allegations as true.  Spectrum implicitly acknowledges that its initial

allegations about Velema were pure speculation.  Now, Spectrum shifts the focus of

its speculation and vaguely alleges that "*one or more* of Dr. Jackson and the Osler

Agents, instructed Velema, to submit numerous foreign office actions from across

the Birnboim III Family" (Am. Countercl., ¶ 64 (emphasis added)) and that

"Genotek's decision to withhold the true nature regarding the scope of enabling

disclosure in the '187 patent from the USPTO was an intentional decision made by

*one or more* of Dr. Jackson and the Osler Agents" (*id*. ¶ 79 (emphasis added)).  This

is insufficient.  Spectrum's vague use of "one or more" shows that it is grasping at

straws rather than alleging *specific* perpetrators and what each *specifically* knew and

did to commit fraud on the U.S. Patent Office ("USPTO").  *E&E Co. v. London

Luxury LLC*, 571 F. Supp. 3d 64, 69 (S.D.N.Y. 2021) (denying motion to amend

---

[10] Pleading "on information and belief" "is not a license to … make claims … without any factual basis or justification," and "if evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule not to persist with that contention."  Fed.R.Civ.P. 11, 1993 Adv. Comm. Notes.  Spectrum admits it has no evidence *after discovery*.

[11] Spectrum cannot rely on "information and belief" statements to survive summary judgment.  *See Columbia Pictures Indus. v. Prof'l Real Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991).

DNA GENOTEK INC.'S MEM. IN OPP'N TO MOT. FOR
LEAVE TO AMEND COUNTERCLAIM

inequitable conduct counterclaim); *see also Rambus, Inc. v. STMicroelectronics N.V.*, 2013 WL 12343708, at *2-3 (N.D. Cal. Mar. 18, 2013) (similar).

*Third*, Spectrum's new allegations fail to meet its burden to plead deceptive intent. "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith." *Exergen*, 575 F.3d at 1329 n.5. Therefore, "when there are multiple reasonable inferences that may be drawn, an intent to deceive cannot be found." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-91 (Fed. Cir. 2011). Spectrum alleges "upon information and belief" that "Dr. Jackson and the Osler Agents . . . decided to selectively withhold from the USPTO Genotek's affirmative representations to other patent offices that the disclosure of the '187 patent did not enable RNA preservation." (Am. Countercl., ¶ 76.) Even before discovery, the Federal Circuit allows information-and-belief-pleading under Rule 9(b) only "when essential information lies uniquely within another party's control" and where "the pleading sets forth the specific facts upon which the belief is reasonably based." *Exergen*, 575 F.3d at 1330. Spectrum hasn't done this, nor could it given these new allegations come months *after* the close of discovery.

Spectrum offers no well-pleaded foundation for its alleged "belief" that the so-called "Osler Agents" had any knowledge that the information purportedly withheld was material to other prosecutions, much less that they purposely withheld it with intent to deceive the USPTO. There is no evidence, or allegations, that the three purported bad actors had any direct interactions with the USPTO during the four-year time frame when the '187 patent application was pending and the purported fraud by omission took place. The only factual allegation Spectrum offers is that "Genotek provides instructions to Osler through Dr. Adele Jackson, Genotek's long-time IP Manager" (Am. Countercl., ¶ 63)—which refers to the Osler firm *generally*, not the specific "Osler Agents." From that thin allegation, Spectrum speculates on "information and belief" that "Osler and the Osler Agents act as a hub coordinating

the overall strategy for prosecuting Genotek's patents and providing instructions to the local attorneys and agents in specific jurisdictions, including in the United States, Israel, India, Australia, Singapore, Japan, and Europe" and "Dr. Jackson provided information to Osler regarding each of the Israeli, Indian, Australian, Singapore, Japanese, and European patent applications discussed above." (*Id.*)

And that speculation stretches still further. Spectrum alleges on "information and belief" that "the Osler Agents were aware of the representations discussed above in the foreign prosecution of the Birnboim III Family and the '116 patent." (*Id.*) But Spectrum's general allegations regarding (1) Osler patent agents serving as a strategic "hub" worldwide and (2) Dr. Jackson supposedly providing information to someone at Osler regarding the foreign patent applications do not—and cannot—support an inference that David Barrans or Nicole Dinaut had actual knowledge of the purported materiality of these references to the Birnboim I prosecution. Without that knowledge, they could not have breached their duties and obligations to the USPTO, let alone acted with specific intent to deceive. And Spectrum admits it has no supporting evidence via its "information and belief" caveat.

Spectrum's allegations regarding Dr. Jackson fare no better. Dr. Jackson is doubly removed from the purported fraud against the USPTO, compared to the "Osler Agents." Under Spectrum's new theory, Dr. Jackson purportedly "provided information" to "Osler," who purportedly withheld that information from Velema, who purportedly and unknowingly made arguments contradicted by that information to the USPTO while prosecuting the '187 patent. Specifically, Spectrum merely alleges that "Genotek, including at least Dr. Jackson, was involved in the global prosecution of the Birnboim III family, including the '795 patent, and therefore knew that the composition of the '187 patent did not preserve RNA." (*Id.* ¶ 75.) This general allegation does not meet Spectrum's high burden. *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 13 F. Supp. 3d 1116, 1126 (D. Or. 2014) (denying motion to amend because a supervisory employee's general knowledge of prosecution of a

patent could not support inference that employee knew about withheld reference).

Indeed, even if Spectrum demonstrated a reasonable inference—at best—that Dr. Jackson and individual "Osler Agents" had general knowledge of Genotek's responses to foreign patent offices, Spectrum's new allegations still would not plausibly support an inference that Dr. Jackson or anyone at Osler made a deliberate decision to withhold material art during prosecution of the '187 patent. Spectrum fails to offer *any* facts to support a plausible inference that Dr. Jackson or the Osler Agents intended to deceive the USPTO. *See* Am. Countercl., ¶ 75 (alleging only that "Genotek decided not to disclose Genotek's representations about the Birnboim I Family to the U.S. Patent and Trademark Office."). *And discovery is complete*.

Assuming, *arguendo*, that the purported foreign office action responses were material to patentability, multiple inferences may be drawn from Spectrum's allegations as to why Dr. Jackson and so-called "Osler Agents" did not disclose these foreign office action responses. More than a dozen attorneys and patent agents helped prosecute the Birnboim I and Birnboim III patent applications globally between the first application in 2002 and the issuance of the '187 patent in 2020. (*See, e.g.*, Dkt. 41-11.) It is plausible, for example, (1) that the three newly charged bad actors were not actually aware of each foreign response, (2) that they believed the responses were non-material to the patentability of the '187 patent because, among other reasons, they were cumulative of other information provided to the USPTO, or (3) that they thought someone else had already disclosed the same information to the USPTO sometime between the first purportedly withheld statement in 2011 and the issuance of the '187 patent in 2020. If Spectrum's new speculation of brazen fraud by the three bad actors is deemed plausible, all of the above innocent possibilities are even more plausible. Spectrum's new allegations therefore fail to adequately plead intent to deceive. *See California Costume Collections, Inc. v. Pandaloon, LLC*, 2022 WL 1062056, at *8 (C.D. Cal. Apr. 7, 2022) (dismissing inequitable conduct claim for failure to plead any underlying facts

supporting the specific-intent-to-deceive allegation).

*Fourth*, Spectrum's new allegations also fail as a matter of law because they cannot meet the required but-for materiality standard. Spectrum must explain both "why" the withheld information is material and not cumulative, and "how" a patent examiner would have used this information in assessing the patentability of the claims. *Exergen*, 575 F.3d at 1329-30. Spectrum's new allegations fail to explain how Genotek's statements to foreign patent offices about the Birnboim I application are not cumulative of other information considered by the examiner during the prosecution of U.S. Patent Appl. No. 15/345,420, the application that led directly to the '187 patent. (*See* Ex. L, at 2.) In fact, Spectrum's allegations completely omit Genotek's disclosure, and the examiner's subsequent consideration, of the International Preliminary Report corresponding to International Patent Application No. PCT/CA2007/001785, dated January 19, 2009, ("International Preliminary Report") during the prosecution of the '187 patent. (*See* Ex. Y, at '045; Ex. M, at '978-979.) The Birnboim III family originated from International Patent Application No. PCT/CA2007/001785. During the prosecution of the '187 patent, Velema disclosed the International Preliminary Report to the USPTO in an IDS dated January 10, 2017. (Ex. Y, at '045-'046.) The international examiner drafting the International Preliminary Report reiterated the same characterization of the Birnboim I application (D1) that Genotek had made to foreign patent offices during the prosecution of the Birnboim III patents:

> In response to this objection, the applicant argued that D1 does not teach or suggest the RNA preserving composition and methods as claimed in the instant application. The applicant outlined that D1 teaches compositions comprising denaturing agents for preserving nucleic acids, and that such denaturing agents include anionic, cationic and/or neutral detergents, as well as alcohols. In contrast, according to the applicant, the instant claims specify that the composition and method employ an anionic detergent and that nowhere in D1 it is taught or suggested that the anionic detergent would be particularly useful in an RNA stabilization composition. Also, the applicant stated that the instant composition requires a buffer at a pH of about 5 to about 8.2, whereas D1 suggests that a pH between 5 and 11 is appropriate for nucleic acid preserving solutions. According to the applicant, nowhere in D1 it is taught or suggested that the narrower pH range of about 5 to 8.2 of the composition presently claimed would be

particularly useful in an RNA stabilization composition.

(Ex. N, at 4.)  On April 26, 2019, the examiner for the '187 patent considered the statements in the International Preliminary Report.  (*See* Ex. M, at '978-979.)  On April 14, 2020, the examiner allowed and issued the '187 patent.  (Dkt. 41-6 at 1.)

Under USPTO rules, information is not material if it is "cumulative of information already of record or being made of record. . . ."  37 C.F.R. § 1.56(b).  Spectrum's new allegations fail to explain how the alleged prior art is not cumulative (and thus not material) given the examiner's consideration of the International Preliminary Report during the prosecution of the '187 patent.  Genotek, through Velema, shared with the USPTO the very argument that Spectrum alleges it withheld from the USPTO, namely that "D1 [Birnboim I] Dl does not teach or suggest the RNA preserving composition and methods as claimed in the instant application [Birnboim III.]"  (Ex. N, at 4.)  As such, the applicant was not required to re-submit the same argument over and over every time Genotek made the same argument in the patent offices in Israel, India, Australia, Singapore, Japan, and Europe.  Courts routinely dismiss inequitable conduct claims with prejudice in just these circumstances.  *See, e.g., California Costume*, 2022 WL 1062056, at *4; *Techshell, Inc. v. Max Interactive, Inc*., 2019 WL 4422682, at *3 (C.D. Cal. Aug. 5, 2019); *see also ParkerVision, Inc. v. Qualcomm Inc.*, 924 F. Supp. 2d 1314, 1319 (M.D. Fla. 2013) ("[T]he PTO was aware of the [prior art] reference . . . and still issued the patent. One cannot assume that a PTO examiner is an ignorant rube who is easily misled by attorney argument, hyperbole, or understatement.").

**2.  Spectrum Cannot Adequately Plead Other Elements of Its Walker Process Attempted Monopolization Claim Either.**

Spectrum's Motion is also futile because its Amended Counterclaim does not, and cannot, plausibly allege that (1) Genotek has a dangerous probability of acquiring monopoly power, (2) competition has been harmed such that Spectrum has suffered antitrust injury, or that (3) Genotek brought (and maintained) this lawsuit with the

specific intent to monopolize the relevant market.

*First*, Spectrum's amended allegations do not support a "dangerous probability" that Genotek would obtain monopoly power in Spectrum's absence. "To pose a threat of monopolization, one firm *alone* must have the power to control market output and exclude competition." *Rebel Oil*, 51 F.3d at 1443. Spectrum does not, and indeed cannot, plausibly allege *facts* that meet this exacting showing—and certainly not in good faith given the facts revealed in discovery, including: (i) Spectrum and others entered the alleged relevant market relatively easily, exponentially increased output almost immediately, and held Genotek to comparable or *smaller* market share[12]; (ii) Spectrum's SDNA prices have long been *substantially higher* than Genotek's prices for competing sales (Ex. B, at 93:3-22); and (iii) factors beyond competition from Spectrum constrain Genotek's prices and Dr. Reiff "cannot disentangle" these factors, (Ex. E, at ¶ 66; Ex. B, at 105:8-107:17). These facts are exactly why Judge Ohta rightly pressed Spectrum's counsel about the significance of third-party competitors, to which she received misleading, unsupported answers.

In fact, Spectrum can't get its story straight. It now alleges—in a stark reversal from before—that, "prior to Spectrum's entry to the market, Genotek ~~wields~~wielded monopoly power in the clinical whole saliva genetic test kit market." (Am. Countercl., ¶ 98.[13]) It then goes on: "Genotek ~~faces~~faced little threat that any existing or potential competitor ~~can~~could readily deprive it of sales by expansion or entry if it ~~imposes~~imposed a SSNIP." (*Id*.) But this contradicts the prior allegation, as Spectrum now admits that Genotek did not wield monopoly power *after Spectrum's entry*, because—as Spectrum has always known—it and other competitors won massive sales over Genotek during the pandemic. (Ex. E, at Exs. 6-9.) Spectrum does not and cannot plausibly plead that Genotek could "control market output and exclude competition." *Rebel Oil*, 51 F.3d at 1443. Spectrum tries to with knowingly

---

[12] *See* Ex. E, at Exs. 7-9; Ex. T, at 41 (Ex. 3); Ex. H, at '105.
[13] Spectrum also now admits that any alleged control Genotek had over prices lasted *only until 2019*. *Id.* ¶ 96. (alleging Genotek could control prices "through 2019").

untrue allegations and misleading omissions, which is not allowed.

Spectrum argues that it "has not changed the core of its allegations regarding attempted monopolization." (Mot. at 15.) It also claims that it "does not change the allegations that the Court relied on to deny DNA Genotek's motion to dismiss Spectrum's attempted monopolization theory." (*Id.* at 16.) But none of this is true. It now admits its market power allegations, including its claim that it and Genotek were the "only two significant players in the market," were untrue. And that's what Judge Ohta accepted as true and relied on in denying dismissal. (Ex. A, at 49:22-24.) Judge Ohta specifically pressed Spectrum's counsel on the boundaries of the relevant market, including the significance of other competitors, because this bears critically on not just whether Genotek *has* monopoly power, but also whether there is a dangerous probability of achieving it given others can constrain Genotek in Spectrum's absence. Spectrum and its counsel misled Judge Ohta about the facts, and now its amended allegations fall far short of its burden. *See, e.g., Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *6 (C.D. Cal. Dec. 7, 2015) (dismissing complaint where plaintiff failed to sufficiently allege dangerous probability of success).

*Second*, Spectrum's amendments also are futile because it fails to allege harm to competition, as it must to establish antitrust injury, a requirement for any Sherman Act claim. *See, e.g., McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 813 (9th Cir. 1988) ("[the] failure to allege injury to competition is a proper ground for dismissal by judgment on the pleadings"). Anticipating this argument, Spectrum contends that attempted monopolization claims involving *Walker Process* fraud are "properly" focused on "the hypothetical world that would result if DNA Genotek is successful in its scheme," citing *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1309 (Fed. Cir. 2016). (Mot. at 14.) This is misleading. Transweb itself proved harm to competition in the *actual* world arising from reduced output due to lost sales resulting from the anticompetitive conduct. *See TransWeb, LLC v. 3M Innovative*

*Properties Co.,* 16 F.Supp.3d 385, 398-407 (D.N.J. 2014) (lost profit damages awarded for sales lost due to antitrust violations). Spectrum and Dr. Reiff have shown no lost sales or reduced output; Spectrum sold every SDNA unit it could year after year during the height of the pandemic and turned away numerous buyers. *See supra* § II.C. Its recent reduction in sales is due to the decline in COVID-19 testing, not Genotek conduct. (*See* Ex. B, at 160:19-161:3; Ex. F, at 75:14-23, 252:20-253:15; Ex. U, at 136:21-24, 138:24-139:8.)

Further, TransWeb also proved that harm to competition—specifically, higher prices—"would have resulted" if 3M forced TransWeb out of the market via a fraudulently-obtained patent. *TransWeb,* 812 F.3d at 1309. Here, Spectrum has no such evidence. The most Dr. Reiff would testify to is that Spectrum's exit from the market might apply "upward pressure on pricing"; he would and could not say that prices actually *would* increase. (Ex. B, at 114:16-116:2.) And this makes sense given that Genotek's prices are substantially lower than Spectrum's for their competing sales, which means that customers turning to Genotek in Spectrum's absence would receive *lower prices*. Spectrum's own damages expert agrees, opining that any sales Genotek would pick up in Spectrum's absence would be at its actual—*not higher*—prices. (*See* Ex. O at 37-43 & App'x 10.) And even if Genotek, upon Spectrum's exit, were to raise its prices by 5% as Dr. Reiff posits (Ex. E, at ¶ 61), customers still would receive lower prices than they do from Spectrum in the actual world, which would reduce the market price (*see* Ex. V, at 111:7-13; 282:13-283:5). Spectrum lacks any evidentiary support or good faith basis to plausibly allege that Genotek's challenged conduct would likely produce higher prices in "the hypothetical world" Spectrum imagines. This too renders its amendments futile. *See Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *7 (S.D.N.Y. Jan. 6, 2020) (denying motion to amend antitrust claims for futility).

And even if Spectrum's characterization of *TransWeb* were right, that would conflict with well-established antitrust principles and controlling Ninth Circuit

jurisprudence. *McGlinchy*, 845 F.2d at 813. *TransWeb* is not controlling here.[14]

*Third,* Spectrum alleges no facts plausibly showing that Genotek brought this lawsuit with the *specific intent to monopolize the relevant market*. Its Amended Counterclaim is at best merely conclusory on this element and is thus futile.

## B. Spectrum's Amendments Are Unduly Prejudicial.

Spectrum's Motion is highly prejudicial to Genotek. Its new inequitable conduct allegations shift accusations from a single individual at a Boston law firm to an entirely new cast of characters, including Dr. Jackson and an undefined number of Canadians at Osler. *See supra* II.E. Spectrum insists that no further discovery is needed (Mot. at 9) but ignores the prejudice to Genotek. For example, Genotek did not list anyone from Osler on its initial disclosures or seek depositions from anyone at Osler because Spectrum alleged no fraud by anyone there. Spectrum's claim that its new allegations "relate only to DNA Genotek's conduct and, as such, all the relevant facts have always been in DNA Genotek's possession" (*id*. at 13) is simply untrue, including because one of the accused, David Barrans, left Osler nearly *six years ago*. (*See* Ex. S.) Genotek chose not to exercise its option to waive privilege to defend against these baseless accusations. When the only allegation of inequitable conduct was against James Velema, a Boston attorney who has never spoken to, written to, or corresponded with anyone at DNA Genotek, the decision whether to waive privilege was an easy decision as there were no communications relevant to Spectrum's inequitable conduct defense. Now that Spectrum is accusing select patent agents from Genotek's Canadian law firm of inequitable conduct, along with Genotek's in-house personnel, the decision whether to waive privilege across its 511-

---

[14] It bears mention that the *TransWeb* district court relied on a 40-year-old case for the proposition that attempted monopolization looks at "whether the 'dangerous probability of success,' *if it had materialized*, would have caused the type of market damage the antitrust laws seek to prevent." *TransWeb*, 16 F.Supp.3d at 410 (quoting *Multiflex, Inc. v. Samuel Moore & Co*., 709 F. 2d 980, 994 (5th Cir. 1983). The Fifth Circuit later indicated, however, that *Multiflex* was "not good precedent" to the extent it permitted Sherman Act violations without injury to competition. *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F. 2d 1183, 1192 n.5 (5th Cir. 1985). And again, there was injury to competition in *TransWeb*.

1   page privilege log is more complicated, particularly now that Genotek relied on that
2   privilege throughout the already-completed depositions of several witnesses. Lastly,
3   if its new allegations did "not require any additional discovery" (Mot. at 1), Spectrum
4   would not need to plead them on "information and belief." Spectrum claims its
5   amendments merely "conform[s] the pleadings to evidence that was in DNA
6   Genotek's possession" (*id*. at 1) while signaling that the same allegations lack any
7   evidence at all.[15] Granting this Motion should not be allowed without permitting the
8   accused Osler agents to defend themselves through affidavits or otherwise at the
9   summary judgment stage and trial. To the extent that Spectrum would then demand
10  the reopening of discovery, such a request should be denied as (1) waived through
11  Spectrum's proclamations that no new discovery is needed, and (2) untimely for the
12  reasons set forth above.[16]

13  Finally, Genotek already has incurred substantial burden and cost from
14  responding to *both* this Motion and Spectrum's Motion to Supplement, which the
15  Court has now denied (Dkt. 316). To avoid further prejudice, this Motion should be
16  denied as well.

## C.   Spectrum's Motion Is Untimely.

18  Spectrum's Motion is extremely untimely. Courts consider "whether the
19  moving party knew or should have known the facts and theories raised by the
20  amendment in the original pleading." *AmerisourceBergen Corp. v. Dialysist West,*
21  *Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (citation and quotes omitted). Spectrum has
22  always known the truth. It seeks leave to amend untrue allegations that Spectrum
23  itself knew were untrue when it made them in August 2021, and for over a year and
24  a half since. (*See supra* § II.C.) Spectrum's counsel also should have known this,

---

[15] *Delphix Corp. v. Actifo, Inc.,* 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19, 2014) (information and belief pleading suggests factual foundation is lacking).
[16] *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir.1989) (denying motion to amend in part because "to put [a party] 'through the time and expense of continued litigation on a new theory, with the possibility of additional discovery' would cause undue prejudice").

ny-2555356

had they conducted the required Rule 11 inquiry. The facts known to Spectrum in August 2021, some of which it now seeks to reflect in its Amended Counterclaim, directly contradict the pivotal allegations that enabled Spectrum's Counterclaim to survive dismissal. It omitted these facts and painted a grossly misleading picture— and it repeats this tactic in its Amended Counterclaim. (*See supra* note 8.) Spectrum's claim that it seeks to amend because of information *produced from Genotek* rather than because it got caught—and called out in a sanctions motion— making untrue allegations is egregiously misleading (and itself sanctionable).

Spectrum's claim that its proposed amendments merely "update its market share allegations based on information that DNA Genotek provided in discovery" underscores Spectrum's undue delay and repeated misleading claims. (Mot. at 10.) Spectrum claims that "Genotek did not provide its complete transactional sales data until January 26." (*Id.*) This is highly misleading. Spectrum's economic expert, Dr. Reiff, did not rely on Genotek's transactional data to compute Genotek's 2019 market share, the *only* specific share Spectrum updates in its amendment. (*See* Am. Countercl., ¶ 93.) Instead, Dr. Reiff (unreliably) derived his 75% share estimate for 2019 from two documents Genotek produced in the fall of 2022, *months before fact discovery closed*. (Kramer Decl., ¶ 28). Moreover, Spectrum did not need these or any other materials from Genotek to recognize the fallacy of the allegations it only now seeks to amend. It knew the truth already. (*See supra* II.C.)

Spectrum argues that its Motion is timely because it "only formalizes what [Spectrum] represented to DNA Genotek on February 2—that Spectrum would only be proceeding with its antitrust claim under a theory of attempted monopolization." (Mot. at 9). Spectrum thus admits that it waited over *two months* to bring this Motion. (*Id.*) But even this is misleading. Spectrum had no intention of amending its existing Counterclaim until after it received Genotek's sanctions motion and refused to voluntarily dismiss its monopolization claim. (*See supra* II.D-E.). Having *refused* to take action until after Genotek threatened sanctions, this Motion is untimely.

Spectrum's new inequitable conduct allegations also are untimely. The new alleged "facts" were available to it even before filing its original Counterclaim. Like Velema, the names and roles of the new alleged perpetrators were publicly available in the prosecution histories of the Birnboim I and III families. For example, the International Searching Authority directed statements regarding the validity of the '785 publication (Birnboim III) in view of the '251 publication (Birnboim I) to the attention of Osler during the international examination of the Birnboim III application. (*See* Ex. W.) This International Search Report with Written Opinion, corresponding to International Patent Application No. PCT/CA2007/01785, appears on the face of the '187 patent. (*See* Dkt. 41-6 at 3.) Spectrum referred to the International Searching Authority's later report, the International Preliminary Report, as one of the foreign office actions Velema submitted in the prosecution of Birnboim III in its original Counterclaim. (*See* Dkt. 284-2, ¶ 126.) Dr. Jackson also submitted a December 10, 2015, declaration about her role at Genotek during the application of U.S. Appl. No. 14/549,344, the parent application to the '187 patent application. (*See* Ex. P, at 1.) David Barrans appeared alongside James Velema in a June 2011 interview with the patent examiner in the prosecution of U.S. Appl. No. 12/338,873, the grandparent application to the '187 patent. (Ex. Q, at 1.)

Spectrum's undue delay also arises from its repeated failure to pursue discovery from Osler. Spectrum argues Genotek "forced" it to wait until December 2022 to learn "that Dr. Jackson and Osler control the worldwide prosecution of DNA Genotek's patents." (Mot. at 13.) That is nonsense. Fact discovery opened on July 15, 2021. (Kramer Decl. ¶ 29.) No one forced Spectrum to wait until December 29, 2022 to take the deposition of the person it accused of inequitable conduct. Moreover, on or around July 25, 2022, Spectrum served Osler with a subpoena. (*See* Ex. X, at 1.) Osler timely served objections. (*See* Kramer Decl., ¶ 30.) Spectrum did not pursue it. Three weeks before close of fact discovery, Spectrum informed Genotek that it intended to obtain discovery from Osler through the letters rogatory

process. (Ex. R, at 5.) Judge Leshner gave Spectrum permission to file a request for letters rogatory to gather discovery from Osler, on the eve of the January 6, 2023, discovery deadline (Dkt. 200-3, Ex. 7, at 1294), but Spectrum turned it down, declining to pursue discovery from Osler a second time.

Finally, Spectrum's claim that "final pieces of this puzzle were confirmed on March 31, 2023" in Genotek's continued 30(b)(6) deposition is highly misleading. (Mot. at 6.) Tellingly, Spectrum submitted no excerpts from that two-hour deposition to support this Motion, relying instead only on excerpts from Jackson's and Velema's *2022* depositions, which confirmed that Velema had never communicated with anyone at Genotek. (Dkt. 200-3, Ex. 3, at 92:7-16.) Spectrum's Motion thus is long overdue, and it has no excuse for its deliberate delay.

### D.    Spectrum's Motion Was Brought in Bad Faith.

The "bad faith" Rule 15(a) factor also favors denying Spectrum's motion to amend. As courts in this Circuit recognize, "[r]epetitious motions to amend can . . . be evidence that a plaintiff seeks to amend her complaint in bad faith." *Patton v. Loadholt,* 2022 WL 17555496, at *3 (E.D. Cal. Dec. 9, 2022) (citation omitted), *report and recommendation adopted*, 2023 WL 2480724 (E.D. Cal. Mar. 13, 2023).

Here, Spectrum's bad faith in moving to amend is evident not just from its untrue allegations, but also from its refusal to consolidate this motion with its motion to supplement its counterclaim (Dkt. 267), which the Court denied on May 2, 2022 (Dkt. 316). Spectrum needed to withdraw that motion upon deciding to seek leave to amend to avoid repetitive, conflicting, and unnecessary motion practice. Spectrum should have filed a single motion with a complete, omnibus Counterclaim, as required. (*See* Dkt. 296 at 9-13.) This tactic was vexatious, confusing, and needlessly costly.[17]

The Court should deny Spectrum's Motion.

---

[17] This Motion is consistent with Spectrum's vexatious tactics. (Dkt. 296, at 24 n.10.)

Dated:   May 2, 2023                    MORRISON & FOERSTER LLP


                                        By: */s/ Brian M. Kramer*
                                            Brian M. Kramer

                                            Attorney for Plaintiff
                                            DNA GENOTEK INC.