Joseph F. Jennings (SBN 145,920)
joe.jennings@knobbe.com
Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
Paul N. Conover (SBN 192,358)
paul.conover@knobbe.com
Nicholas M. Zovko (SBN 238,248)
nicholas.zovko@knobbe.com
Brandon G. Smith (SBN 307,676)
brandon.smith@knobbe.com
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main St., 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Defendant
SPECTRUM SOLUTIONS L.L.C.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DNA GENOTEK INC., a Canadian Corporation,<br><br>Plaintiff,<br><br>v.<br><br>SPECTRUM SOLUTIONS L.L.C., a Utah Limited Liability Company,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIM. | Case No. 3:21-cv-00516-RSH-DDL<br><br>**MEMORANDUM IN OPPOSITION TO DNA GENOTEK'S MOTION FOR SANCTIONS**<br><br>Hon. Robert S. Huie<br>Magistrate Judge David D. Leshner |

# TABLE OF CONTENTS

**Page No.**

I.   INTRODUCTION ........................................................................................1

II.  FACTUAL BACKGROUND....................................................................3

    A.   Spectrum Reasonably Asserted And Pursued Inequitable Conduct ...............................................................................................3

    B.   Spectrum Reasonably Asserted And Pursued Antitrust................5

III. DNAG'S MOTION UNDER 28 U.S.C. § 1927 IS BASELESS .........8

    A.   Section 1927 Sanctions Are Reserved For Truly Rare Cases Where An Attorney Litigates In Bad Faith ....................................8

    B.   Spectrum Inequitable Conduct Counterclaim Was Justified ........9

        1.   Spectrum's Inequitable Conduct Counterclaim was Meritorious.........................................................................9

        2.   The Public Record Supported Spectrum's Allegation that Mr. Velema Intended to Deceive the USPTO .................11

        3.   Spectrum's Orderly Pursuit of Discovery was Based on Rational Litigation Strategy and Is Certainly Not Sanctionable Conduct ........................................................12

    C.   Spectrum Filed And Pursued Well-Supported Antitrust Counterclaims..............................................................................15

        1.   Spectrum's Allegations Were Well Supported and Accurate ...............................................................................15

        2.   Spectrum Opposed DNAG's Motion to Dismiss in Good Faith..................................................................................18

        3.   Discovery Confirmed the Counterclaims' Accuracy........................18

        4.   DNAG's Evidence at Most Raises Factual Disputes........................21

        5.   Spectrum's Acted Reasonably in Not Combining its Pending Motion to Supplement With its Motion to Amend ..............................................................................24

IV.  DNAG'S MOTION FOR ATTORNEYS' FEES UNDER THIS COURT'S INHERENT POWER IS ALSO BASELESS ...................25

V.   CONCLUSION........................................................................................25

# TABLE OF AUTHORITIES

**Page No(s).**

*AliveCor, Inc. v. Apple, Inc.*,
592 F.Supp.3d 904 (N.D. Cal. 2022) ................................................... 16, 18

*Am. Pro. Testing Serv. v. Harcourt Brace Jovanovich Legal & Pro. Publn's*,
108 F.3d 1147 (9th Cir. 1997) ...................................................... 24

*Azizian v. Federated Dep't Stores*,
499 F.3d 950 (9th Cir. 2007) ...................................................... 9

*Carlock v. Collins Motor Co.*,
2008 WL 943037 (S.D. Cal. Apr. 7, 2008) ................................. 8

*Cortina v. Wal-Mart Stores, Inc.*,
2016 WL 4556455 (S.D. Cal. Sept. 1, 2016) ............................... 20

*Dolores Press, Inc. v. Robinson*,
2017 WL 11596028 (C.D. Cal. Jan. 26, 2017) .......................... 25

*Fiskars, Inc. v. Hunt Mfg. Co.*,
221 F.3d 1318 (Fed. Cir. 2000) ................................................... 9

*Frost v. LG Elecs., Inc.*,
2017 WL 2775041 (N.D. Cal. June 27, 2017) ............................ 18

*Guardant Health, Inc. v. Found. Med., Inc.*,
2020 WL 2461551 (D. Del. May 7, 2020) ................................... 24

*In re Keegan Mgmt. Co., Secs. Litig.*,
78 F.3d 431 (9th Cir. 1996) ...................................................... 8

*Kohler v. Flava Enters.*,
2011 WL 2448338 (S.D. Cal. June 17, 2011) ......................... 8, 25

*Levine v. Millennium Trust Co.*,
2013 WL 12157580 (S.D. Cal. Mar. 20, 2013) .......................... 8

*Nystrom v. TREX Co.*,
424 F.3d 1136 (Fed. Cir. 2005) ................................................... 20

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Physician's Surrogacy, Inc. v. German,*
  311 F. Supp. 3d 1190 (S.D. Cal. 2018) ...................................................... 25

*Primus Automotive Financial Services, Inc. v. Batarse,*
  115 F.3d 644 (9th Cir. 1997) ...................................................................... 25

*Puterbaugh v. Oorah, Inc.,*
  2023 WL 3335070 (C.D. Cal. Apr. 5, 2023) .............................................. 25

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
  373 F.3d 57 (1st Cir. 2004) ........................................................................ 21

*TransWeb, LLC v. 3M Innovative Props., Co.,*
  812 F.3d 1295 (Fed. Cir. 2016) ........................................................... 23, 24

*Trulis v. Barton,*
  107 F.3d 685 (9th Cir. 1995) ........................................................................ 8

*United States v. Dunkell,*
  927 F.2d 955 (7th Cir. 1999) ..................................................................... 17

*Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.,*
  382 U.S. 172 (1965) ................................................................... 3, 5, 23, 24

## OTHER AUTHORITIES

28 U.S.C. § 1927 ................................................................................... 8, 9, 25

35 U.S.C. § 285 .............................................................................................. 9

# I. **INTRODUCTION**

DNA Genotek ("DNAG") accuses counsel of litigating Spectrum's Counterclaims in bad faith and seeks the extraordinary remedy of monetary sanctions imposed against Spectrum and its counsel.  But DNAG's sanctions motion is based upon a caricature of Spectrum's Counterclaims and the evidence in this case.  Spectrum accurately alleged that DNAG made numerous representations to patent offices around the world that the asserted U.S. Patent No. 10,619,187 ("'187 patent") does not enable RNA preservation.  DNAG even submitted test data to numerous patent offices around the world proving this.  Yet, DNAG—through its U.S. patent attorney James Velema—then pursued the '187 patent in the U.S., obtaining claims directed to the preservation of both RNA and DNA.  At the pleading stage, Spectrum reasonably believed Mr. Velema was the "who" in its inequitable conduct claim against DNAG.  He (1) prosecuted the '187 patent, (2) contemporaneously prosecuted a second DNAG patent (U.S. Patent No. 10,000,795 (the "'795 patent")) that detailed experiments DNAG used to prove that that the disclosure of the '187 patent could not preserve RNA, and (3) had the foreign office actions in response to which DNAG represented that the '187 patent could not preserve RNA and submitted those office actions to the USPTO during the prosecution of the '795 patent (but not the '187 patent).

Contrary to DNAG's assertions, Spectrum's tangential allegation that Mr. Velema prosecuted DNAG's '116 patent was never the "lynchpin" or "leading support" of Spectrum's inequitable conduct claim.  In its January 2022 Opposition to Motion to Dismiss, Spectrum acknowledged that Mr. Velema did not prosecute the '116 patent and when the Court denied DNAG's motion, it understood that fact. Instead, the Court found that the "main subject of the dispute" on DNAG's motions was, instead, whether DNAG's undisclosed representations were material to the patentability of the '187 patent. The Court held that at the pleading stage, Spectrum had carried its burden to show that they were.

In his deposition, Mr. Velema distanced himself from DNAG's contradictory positions, asserting he had never read the entire '795 patent that he prosecuted, did not grasp the relevance of the foreign office actions that he submitted to the USPTO in the '795

patent, and did not have or even look for or request the office action responses in which DNAG characterized the '187 and '795 patents he was prosecuting.  Mr. Velema testified that he was a vehicle for DNAG's prosecution and was directed by others.  DNAG's Director of Intellectual Property, ████████████, testified that she managed DNAG's worldwide patent portfolio through DNAG's Canadian firm ████.  Spectrum also learned that ████████ personally conducted tests showing that the '187 patent does not preserve RNA.  Promptly after obtaining the discovery, Spectrum sought to amend its inequitable conduct Counterclaim to conform to the evidence and assert that Mr. Velema was a vehicle for the inequitable conduct and was directed by ████████ through the ████████.  All of this was entirely reasonable in light of the discovery Spectrum obtained.

DNAG's treatment of Spectrum's antitrust Counterclaim is much the same— caricature and outright fabrication of allegations.  DNAG claims Spectrum portrayed itself as a "small, struggling victim" at the pleading stage, but Spectrum's Counterclaims repeatedly alleged that DNAG was using a fraudulent patent in an attempt to exclude its "most significant competitor" not any small struggling victim.  DNAG claims Spectrum's initial market share estimates were wrong, but does so by pointing to market shares in a narrow "COVID" market that Spectrum never pled.  In reality, Spectrum's market share estimates and other allegations were well supported and reasonable in view of Spectrum's information.  DNAG did not provide complete confidential sales data necessary to calculate specific market shares until *after* the close of discovery.  As demonstrated below, that data showed that Spectrum's market share estimates were *accurate* at the time of filing.  However, the data also showed increasing competition after the filing resulting from the unpredictable surge caused by the new Delta variant.

Accordingly, just eight days after receiving DNAG's complete confidential sales data, Spectrum informed DNAG that it was narrowing its case to attempted monopolization and that the parties need not address monopolization in their expert reports.  Notably, DNAG's financial data did not diminish Spectrum's attempted monopolization allegations in any way, nor undermine the central theory of Spectrum's Counterclaim that DNAG was

asserting a fraudulent patent to eliminate its "most significant competitor" and to obtain monopoly power. Spectrum's expert explained in detail how DNAG's scheme would eliminate competition from DNAG's most significant competitor, provide DNAG a ▮ share, substantially increase market concentration, increase pricing, reduce product choice and reduce innovation. DNAG engaged in classic *Walker Process* attempted monopolization, and all of Spectrum's conduct was entirely reasonable in view of Spectrum's documents and the discovery it obtained.

## II. FACTUAL BACKGROUND[1]

### A. Spectrum Reasonably Asserted And Pursued Inequitable Conduct

The '187 patent is part of DNAG's "Birnboim I" patent family based on an original application filed in 2003. Doc. No. 27, ¶¶ 20-21, 55. Claim 1 recites a "device for receiving and *preserving nucleic acid* in a biological sample." Doc. No. 20-1, col. 19, ll. 34-35.[2] "Nucleic acid" includes both DNA and RNA, per the specification (*id.*, col. 7, ll. 28-31) and the parties' agreed construction (Doc. No. 177, p. 12).

Beginning in 2007, DNAG filed another patent application in the U.S. and corresponding applications in various countries, which were directed to preserving RNA specifically. Doc. No. 27, ¶ 22. These applications are referred to as the "Birnboim III" patent family. The applications explain in detail the difficulty with preserving RNA (Doc. No. 27-11, PageID.592-93), and state, "there is a need [as of 2007] for compositions and methods that would allow RNA to be reliably recovered from bodily fluids and/or secretions and tissues" (*id.* at col. 2, ll. 52-53). The Birnboim III applications faced rejections in patent offices around the world in view of DNAG's prior disclosure in Birnboim I. Doc. No., ¶ 23.

---

[1] Throughout this brief, Spectrum relies upon evidence not previously presented to the Court in connection with prior motions. In so doing, Spectrum is not seeking reconsideration of any prior Court order. Rather, Spectrum is merely providing the Court with a full picture of the reasonableness of its Counterclaims. DNAG was aware of this additional evidence before it filed the present motion.

[2] Unless noted otherwise, all emphasis in quoted text is added.

In response, DNAG stated that Birnboim I[3] did not enable RNA preservation.  For example, DNAG represented to patent offices in each of Israel, Australia, and Europe that: "[T]he composition of [Birnboim I] is not suitable for RNA preservation in biological samples."  Doc. Nos. 27-9, PageID.551; 27-2, PageID.497; 27-4, PageID.514.  Similarly, DNAG declared to the Singapore Patent Office that "[Birnboim I] does not disclose a composition and method for preserving RNA at room temperature."  Doc. No. 27-5, PageID.520 ("[N]owhere in [Birnboim I] is there any demonstration of the use of a composition or method as presently claimed to preserve RNA in a biological sample at room temperature.").  And to the Japanese Patent Office, DNAG asserted that Birnboim I "cannot stabilize ribonucleic acid at room temperature."  Ex. F at -674, -678 ("[T]he [Birnboim I] composition is not suitable for the RNA storage of a biological sample.").  DNAG even supported its arguments with experimental data proving that Birnboim I did not enable preservation of RNA.  *See, e.g.*, Doc. No. 27-9, PageID.549-552 ("experimental evidence supports [DNAG's] position that the composition of D1 [Birnboim I] is not suitable for RNA storage.").

DNAG also included test results in the Birnboim III patent specification to prove Birnboim I could not preserve RNA.  DNAG relied upon this testing to argue the patentability of Birnboim III for preserving RNA.  For example, DNAG told the EPO, "As demonstrated in Example 2 [of Birnboim III], the composition of D1 [Birnboim I] ***was not successful in preserving RNA*** as evidenced by the lack of intact, high molecular weight RNA in the sample stored with Oragene™ [the composition of Birnboim I] for three days at room temperature."  Doc. No. 27-8, PageID.545; Doc. No. 339-2, ¶¶ 89, 96.

In 2016, after making these representations regarding Birnboim I's inability to preserve RNA, DNAG, through its U.S. attorney James Velema, filed the Birnboim I continuation application that led to the '187 patent.  Doc. No. 20-1.  Despite repeatedly telling patent offices around the world that the disclosure of the '187 patent does not enable

---

[3] The Birnboim I application at issue was a patent publication (the '251 publication). The publication has the same disclosure as the '187 patent.  *Id.*, ¶ 20.

RNA preservation, DNAG pursued claims directed to RNA preservation in the '187 patent. And further, while Mr. Velema was prosecuting the '187 patent application he was contemporaneously prosecuting the application for the '795 patent, a Birnboim III patent. While doing so, Mr. Velema submitted to the USPTO foreign patent office actions rejecting DNAG's patent applications in view of the disclosure of the '187 patent. Doc. No. 27-11 at "Other Publications." But Mr. Velema critically did not submit those office actions or DNAG's responses to the office actions or even identify that the background of the '795 patent he was prosecuting included experiments material to the patentability of the '187 patent. Spectrum relied on DNAG's contemporaneous prosecution of inconsistent patents and its withholding of these material representations to allege that the '187 patent was procured through inequitable conduct. *See generally* Doc. No. 27. Spectrum also alleged antitrust claims based on DNAG's assertion of the '187 patent, knowing that the patent did not meet the enablement requirement and knowing that it was obtained by intentionally concealing that information from the USPTO. *Id.*

**B.**   **Spectrum Reasonably Asserted And Pursued Antitrust**

DNAG long had a dominant share in the market for clinical whole saliva devices. Indeed, internal DNAG documents confirmed DNAG had a ▮▮▮ share from 2017 to 2019. Doc. No. 334-4 ("Reiff Rpt"), ¶ 76. The COVID pandemic created an unprecedented opportunity for Spectrum to compete against DNAG. Doc. No. 27, ¶¶ 94-95; Reiff Rpt, ¶ 86. In response, DNAG asserted fraudulently-obtained patents to exclude Spectrum and recapture monopoly power—classic anticompetitive conduct under *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 175 (1965). Doc. No. 27, ¶¶ 102-04; Reiff Rpt, ¶ 86.

On August 18, 2021, Spectrum filed Counterclaims alleging that DNAG violated Section 2 of the Sherman Act. Doc. No. 27, ¶¶ 137-52. Spectrum alleged that DNAG's market share "***in 2019*** was greater than at least 65% and by Spectrum's estimates may have approached 80-85%." *Id.*, ¶ 93. Spectrum acknowledged that "[b]ecause Spectrum received the first EUA for COVID-19 testing, its market share grew in 2020." *Id.*, ¶ 95.

However, Spectrum further explained that "as the demand for COVID-19 testing has slowed, upon information and belief, the parties' relative market shares have returned to levels similar to 2019." *Id*. Spectrum alleged its mid-2021 share was "below 15%." *Id*., ¶ 93. Spectrum thus alleged monopolization—that DNAG was engaging in anticompetitive conduct to maintain monopoly power. *Id*. ¶ 139. Spectrum asserted, in the alternative, attempted monopolization—that if DNAG did not have monopoly power, there was at least a dangerous probability DNAG would acquire such power. *Id*. ¶¶ 146-47.

Spectrum's allegations were based on extensive information, including third-party reports characterizing DNAG as commanding a "80-85% share" and observing that "DNAG is unanimously recognized for its high pricing, with some customers feeling that the company is price gouging and taking advantage of its ***monopolistic market share***…." Doc. No. 334-11 at 219, 230, 233; Doc. No. 334-10. Those reports, including an Ernst & Young report, and the underlying interviews (*e.g.*, Doc. No. 349-28; Ex. K), supported numerous other Spectrum allegations, from DNAG's long term contracts[4] to its pricing practices.[5]

Spectrum sought DNAG's confidential sales data so Spectrum's expert could precisely calculate the parties' market shares. DNAG did not produce such data until November 2022, and then updated it on December 31, 2022. Razai Decl., ¶ 2. But DNAG's data sets accounted for ***less than half*** of the publicly reported revenue from DNAG's parent company's SEC filings. Doc. No. 286-6. After Spectrum identified this discrepancy, DNAG recognized the error and produced (apparently) complete data on January 26, 2023, ***after*** the close of fact discovery. *See id*.

---

[4] *See, e.g.*, Doc. No. 349-27 at -76219 ("average supplier contract is 2-3 years long"), -76233 ("Helix has a supplier agreement with [DNAG] that includes yearly purchase obligations"), -76239 ("Natera's agreement with [DNAG] included an early termination clause of roughly 1 year"), -76247 ("[DNAG] is pitching a 5-year contract to Invitae");

[5] *See, e.g.*, Ex. K at -76011 ("[DNAG] is the only game in town … their prices have crept up."); *see also generally* Doc. No. 349-28 (customer interviews); Ex. K at 76011-76032 (customer interviews showing Genotek as main incumbent).

DNAG's data showed that the Counterclaims' market share estimates were quite accurate. Reiff Rpt., ¶ 76; Doc. No. 334-1, ¶ 2; Ex. L (Spectrum sales data); *see also* Razai Dec. ¶ 30 (table comparing Counterclaims' allegations with Spectrum's expert testimony and evidence, hereinafter "Table"). For example, consistent with Spectrum's Counterclaims, (1) Genotek's market share in 2019 and earlier was "at least 65%" (actually ▮▮); (2) Spectrum's "market share grew in 2020"; (3) by mid-2021, as demand for COVID testing was slowing, the parties' relative market shares were returning to levels similar to 2019 (DNAG's share was rising to ▮▮ and Spectrum's was falling to ▮▮); and (4) Spectrum's market share near the time of filing was "below 15%" (approximately ▮▮). Reiff Rpt., ¶ 76; Doc. No. 334-1, ¶ 2; Ex. L (Spectrum sales data).

The data also showed, however, that around the time Spectrum filed its Counterclaims, Spectrum's market share began increasing again. *See* Doc. No. 334-1, ¶¶ 2-3; Reiff Rpt, ¶ 76. This increase coincided with an increase in demand for COVID testing based on the unpredictable surge caused by the new Delta variant. Doc. No. 334-1, ¶ 2. On February 2, 2023, eight days after receiving DNAG's data, Spectrum informed DNAG that it was narrowing its case to attempted monopolization, and agreed that neither party needed to address monopolization in expert reports. Doc. Nos. 267-5 & 267-6.

DNAG's financial data did not diminish Spectrum's attempted monopolization allegations. Spectrum's expert's detailed sixty-seven-page report explained that DNAG's scheme would eliminate competition from DNAG's most significant competitor, provide DNAG a ▮▮ share, substantially increase market concentration, increase pricing, reduce product choice and reduce innovation. Reiff Rpt, ¶¶ 76, 90-101.

DNAG nonetheless served (but did not file) a Rule 11 motion against Spectrum's antitrust Counterclaim. Spectrum told DNAG that its motion had no merit, but pursuant to Ninth Circuit precedent and to avoid wasting the parties' and the Court's resources, Spectrum amended its Counterclaims to: (1) formally drop the monopolization claim it previously told DNAG it was not pursuing, (2) focus its antitrust allegations on attempted monopolization, and (3) update Spectrum's inequitable conduct allegations based on

information learned in discovery. Ex. B.[6]   The Court denied Spectrum's Motions to Supplement and Amend and instructed the parties to meet and confer on Final Judgment. Doc. No. 346.  DNAG then filed its present Motion.

### III.  DNAG'S MOTION UNDER 28 U.S.C. § 1927 IS BASELESS

### A.  Section 1927 Sanctions Are Reserved For Truly Rare Cases Where An Attorney Litigates In Bad Faith

28 U.S.C. § 1927 permits a court to award attorneys' fees personally against an attorney if the attorney "multiplies the proceedings in any case unreasonably and vexatiously." "[S]ection 1927 sanctions must be supported by a finding of subjective bad faith." *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996). "Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id.*

Section 1927 sanctions "should be reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Kohler v. Flava Enters.*, 2011 WL 2448338, at *3 (S.D. Cal. June 17, 2011). "Sanctions under 28 U.S.C. § 1927 are punitive in nature and require clear and convincing evidence that every facet of the litigation was patently meritless as well as evidence of bad faith, improper motive, or reckless disregard of the duty owed to the court." *Levine v. Millennium Trust Co.*, 2013 WL 12157580, at *1 (S.D. Cal. Mar. 20, 2013).

DNAG's cited cases illustrate the severe misconduct necessary to support sanctions under Section 1927. *See Trulis v. Barton*, 107 F.3d 685, 688-94 (9th Cir. 1995) (attorney litigated claims he knew were released, on behalf of plaintiff-clients who explicitly requested that they be dismissed from the case because of the release); *Carlock v. Collins Motor Co.*, 2008 WL 943037 (S.D. Cal. Apr. 7, 2008) (awarding $20,000 in sanctions against plaintiff's counsel who vexatiously filed 84 separate actions in this Court under the

---

[6] As Spectrum explained in detail in its Motion to Amend and contrary to DNAG's characterizations, Spectrum's proposed amendments did not "concede[]" any "inaccuracy" in the Counterclaims, or "fundamentally" alter pivotal antitrust allegations. *See* Doc. No. 285 at 9-16; Doc. No. 332 at 4-8.

Americans with Disabilities Act, all for the same plaintiff); *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1328 (Fed. Cir. 2000) (affirming sanctions of $8,582.50 after a full bench trial where the defendant argued that a prior art device had not been submitted to the USPTO but the USPTO records showed that a brochure for that device was submitted.).

Here, in contrast, Spectrum defeated DNAG's claims of infringement of both patents in suit. Thus, DNAG cannot obtain attorneys' fees on its patent claims under 35 U.S.C. § 285 because DNAG is not the prevailing party. In addition, even if DNAG had prevailed on Spectrum's antitrust claims—which it did not—DNAG would be barred from obtaining fees under the "asymmetrical" antitrust fee provision, which is available only to prevailing antitrust **plaintiffs**. *Azizian v. Federated Dep't Stores*, 499 F.3d 950 (9th Cir. 2007).

Instead, DNAG resorts to accusing Spectrum's attorneys of wrongdoing under Section 1927. DNAG cannot come close to meeting its heavy burden of proving bad faith and frivolousness under Section 1927. Indeed, though it is not Spectrum's burden to prove this, Spectrum's Counterclaims were meritorious.

**B.    Spectrum Inequitable Conduct Counterclaim Was Justified**

DNAG points to three decisions made by counsel that it contends were in bad faith. First, DNAG asserts that counsel had no reasonable basis to plead inequitable conduct in the first place. Second, DNAG asserts that counsel had no basis to allege DNAG's U.S. patent attorney, James Velema, intended to deceive the USPTO. Third, DNAG asserts that counsel should have deposed Mr. Velema sooner, which would have exposed the alleged lack of merit in Spectrum's inequitable conduct allegation. DNAG is wrong at every turn.

**1.    Spectrum's Inequitable Conduct Counterclaim was Meritorious**

DNAG withheld from the USPTO material information that the '187 patent could not preserve RNA. Indeed, DNAG expressly and repeatedly represented that the disclosure of the '187 patent could not preserve RNA. It did so in the European Patent Office and patent offices in Israel, Australia, Singapore, the Indian, and Japan. *See* Doc. Nos. 27-2 to 27-9. In at least Europe and Japan, DNAG submitted experimental evidence to prove that the disclosure of the '187 patent could not preserve RNA. DNAG even pointed to

-9-

experiments in the disclosure of Birnboim III to prove that the specification of the '187 patent could not preserve RNA.

Subsequent to these representations, DNAG pursued claims in the '187 patent that encompassed RNA preservation. DNAG withheld these prior inconsistent representations and test results from the USPTO. As a result, the USPTO allowed the '187 patent with claims encompassing preserving RNA and DNA, even though DNAG knew that the '187 patent could not preserve RNA. Indeed, DNAG had the experimental data to prove it.

DNAG ignores Spectrum's allegations and instead claims that Spectrum's "leading support" and the "lynchpin" of its claim was that Mr. Velema was prosecution counsel in the '116 patent. This argument is frivolous. None of DNAG's material omissions related to the '116 patent. Instead, DNAG's prosecution of the '116 patent showed that the USPTO had previously rejected claims encompassing RNA preservation as not enabled by the disclosure of the '187 patent. Doc. No. 27-10, PageID.558-565. Spectrum erroneously identified Mr. Velema as DNAG's prosecution counsel for the '116 patent, and acknowledged its error in its Opposition to DNAG's Motion to Dismiss. Doc. No. 76 at 5, n.3. Thus, the Court understood that error when it denied DNAG's Motion to Dismiss.

As the Court's ruling showed, that misidentification was not relevant to Spectrum's inequitable conduct claim nor did it affect the fact that the examiner had previously found that the disclosure of the '187 patent does not enable RNA preservation. In fact, the Court never discussed the '116 patent, much less found it to be any "lynchpin" of Spectrum's claim, instead explaining that "[t]he *main subject of the dispute* here appears to be whether the lie – or whether – the factual materiality of the allegedly undisclosed information and how that operated." Ex. G at 47:3-5. The Court concluded that the allegations showed the information DNAG withheld was material. *Id.* at 47:19-21.

In its sanctions motion, DNAG does not dispute that it explicitly represented to various foreign patent offices that the disclosure of the '187 patent does not enable the preservation of RNA, that it submitted experimental evidence to foreign patent offices to prove its position, or that it performed a separate experiment that it disclosed in its

Birnboim III family to show that the disclosure of the '187 patent does not enable the preservation of RNA. Moreover, DNAG cannot dispute it withheld these material prior representations and experiments during prosecution of the '187 patent. DNAG deceived the USPTO into allowing the '187 patent knowing that the patent did not enable the preservation of RNA. DNAG does not dispute these central elements of inequitable conduct. Yet, it insists that Spectrum's counsel acted in bad faith by even raising the issue in this Court. This argument is simply frivolous.

## 2.   The Public Record Supported Spectrum's Allegation that Mr. Velema Intended to Deceive the USPTO

DNAG argues that counsel should be sanctioned for naming Mr. Velema as the "who" in Spectrum's inequitable conduct claim. This argument fails.

Contemporaneous with the '187 patent, Mr. Velema was prosecuting DNAG's U.S. counterpart in the Birnboim III family—the '795 patent. The disclosure of the '795 patent included experimental evidence related to the inability of the '187 patent to preserve RNA. Doc. No. 27-11 at Example 2 (14:33-15:58). Spectrum had every reason to believe that Mr. Velema read the patent he was prosecuting. Spectrum also had every reason to believe that Mr. Velema knew the contents of the withheld responses to the foreign office actions. After all, he submitted the office actions to the USPTO when prosecuting the '795 patent. *Id.* at "Other Publications." It would be unusual for an attorney to know only of excerpts of prosecution history materials he was submitting to the USPTO. It would also be unusual for a patent attorney not to know how the patent he was prosecuting (the '795 patent) was being described by the company around the world, especially where it was being repeatedly rejected as unpatentable in view of another patent he was prosecuting (the '187 patent").[7]

---

[7] Although DNAG submitted a written request for a pre-motion conference, filed opening and reply briefs, and participated in an hour-long transcribed hearing on its Motion to Dismiss, it points only to an un-transcribed statement during a call with the Court where DNAG allegedly explained to Spectrum that Mr. Velema did not know about statements made in foreign countries. Mot. at 23. Even if DNAG made this statement, Spectrum was not required to credit counsel's unsupported self-serving argument that a patent attorney prosecuting a patent in the United States (the '795 patent) would be completely ignorant of the company's characterizations of the invention in foreign patent offices.

The public record also belies DNAG's assertion that Mr. Velema was merely local counsel and uninvolved in DNAG's strategy. During prosecution of another U.S. patent in the Birnboim I family, Mr. Velema conducted an interview with the patent examiner. In the interview summary, the examiner noted: "Applicant's representative [Mr. Velema] also generally shared that they were not able to argue this case in writing because of a pending litigation." Doc. No. 27-12. The examiner later issued an office action and again noted: "Per the interview summary Applicant's [sic] expressed a desire to leave the prosecution history void of any substantive discussion that could interfere with the pending litigation." Doc. No. 27-13 at PageID.617. That application eventually issued as U.S. Patent No. 11,572,581, which formed the basis for DNAG's request for reconsideration of the Court's construction of "reagent compartment." Doc. No. 243 at 20-21.

Mr. Velema testified in his deposition that he was merely a vehicle through which DNAG's Canadian firm, ▓▓▓, prosecuted the patent. Mr. Velema testified that he ***did not even read*** the entire '795 patent he was prosecuting in the United States, and only reviewed it as to form and not for substance. Ex. J at 72:5-17. The '795 patent included experimental evidence related to the inability of the '187 patent to preserve RNA. Doc. No. 27-11 at Example 2; Doc. No. 27-9; Doc. No. 339-2, ¶¶ 88-94. Mr. Velema also surprisingly testified that he never grasped the importance of the office actions he submitted in the prosecution of the '795 patent nor did he ever ask for (or was ever given) the responses to those office actions. Ex. J at 96:19-97:14, 98:16-99:7. Even if those unusual facts were true, that testimony came during discovery and after Spectrum's allegations. It was neither bad faith nor reckless for Spectrum's counsel to name Mr. Velema as the "who" in the inequitable conduct allegations against DNAG.

### 3.   Spectrum's Orderly Pursuit of Discovery was Based on Rational Litigation Strategy and is Certainly not Sanctionable Conduct

DNAG next argues that counsel acted in bad faith by not taking Mr. Velema's deposition sooner. This argument lacks merit. Counsel took Mr. Velema's deposition within the discovery period, which was entirely reasonable and consistent with the

Scheduling Order.[8]  Moreover, the timing of DNAG's document production and privilege log made it impractical for Spectrum to take earlier depositions.  DNAG produced over 75% of its documents in October and November 2022 and produced its first privilege log on November 16, 2022.  Doc. No. 334-2, ¶ 11; Razai Decl., ¶ 30. Spectrum's decision to take most depositions after DNAG's production was entirely reasonable and not bad faith.[9]

Moreover, discovery had already shown how others were also involved in DNAG's inequitable conduct.  During her deposition, _____, testified that she was DNAG's Director of Intellectual Property during the entire pendency of the application that led to the '187 patent.[10]  Ex. N at 314:16-21.  _____ admitted she provided the experimental data used to prove DNAG's arguments in foreign patent offices that the disclosure of the '187 patent does not enable RNA preservation.  *Id.* at 566:13-567:3.  _____ is an inventor on Birnboim III and admitted to conducting the experiment in its specification, which DNAG later submitted to patent offices to prove that Birnboim I (the '187 patent) did not enable the preservation of RNA.  *Id.* at 506:4-507:19.  _____ was instructed by counsel not to answer relevant questions regarding the '187 patent based on allegations of privilege, including:

---

[8] DNAG ignores that in January 2022, Spectrum noticed the early deposition of Scott Rabuka, DNAG's Senior Director, Molecular Products.  DNAG delayed providing dates of availability and even tried to dissuade Spectrum from deposing Mr. Rabuka by wrongly asserting that "[i]f Mr. Rabuka's deposition goes forward, please understand that DNA Genotek objects to any Rule 30(b)(6) notice that designates any matters for examination about Mr. Rabuka's relevant knowledge or documents, if any." Ex. E. Spectrum eventually deposed Mr. Rabuka in April 2022, but despite having worked at DNAG for over fifteen years, Mr. Rabuka claimed that he had no knowledge of who was in charge of DNAG's patent portfolio. Ex. M.

[9] DNAG suggests that Spectrum should have taken depositions earlier, but its suggestion is inconsistent with DNAG's own conduct.  DNAG took its first deposition of a fact witness on November 18, 2022 and took most of its depositions in December 2022. Razai Decl., ¶ 30.

[10] On December 14, at 10:55 pm Eastern Time (the night before _____ in-person deposition in Ottawa), DNAG clawed back more _____ docum _____ edly privileged. Ex. C. Spectrum's counsel intended to ask _____ about several of those document _____'s massive, last-minute clawback _____ Spectrum from doing so.  After _____ deposition, DNAG reproduced more than 500 of those some with _____ but Spectrum no longer had an opportunity to question _____ about them. Razai Decl., ¶ 5.

- "Did you receive draft responses of the office action responses that were filed in prosecution of this application ['187 patent]?"  *Id.* at 315:2-4.

- "[D]id you receive communications from ▓▓▓ related to the prosecution of [the '187] patent?"  *Id.* at 315:22-316:2.

- "Did you review draft IDSs that were filed during prosecution of [the '187] patent?"  *Id.* at 316:15-16.

- "Did you receive from counsel the IDSs that were filed during prosecution of [the '187] patent?"  *Id.* at 316:22-317:3.

- "Did you receive the responses to office actions that were filed during prosecution of [the '187] patent?"  *Id.* at 317:5-7.

Further, despite being DNAG's corporate designee regarding the "preparation and prosecution of [the '187 patent]" (Exs. H and I), ▓▓▓▓▓ would not testify about her own involvement in the prosecution: "Q. Were you involved in any way in the prosecution of this [187] patent? A. I don't recall."  Ex. N at 316:10-12.

On February 28, 2023, the Court ordered DNAG to make a witness available for further questioning.  Doc. No. 259.  DNAG delayed the continued deposition until March 31, 2023—the last day under the Court's order—and instead of ▓▓▓▓, DNAG designated a former lab technician who had no experience with the company's patent portfolio to continue the deposition.  *See* Ex. D.

Spectrum continued to pursue documentary evidence showing that ▓▓▓▓ was involved in the strategy and prosecution of the '187 patent.  DNAG had previously produced a spreadsheet that ▓▓▓▓ had maintained where she tracked DNAG's patent applications, including all of the foreign patents related to the Birnboim III application ***and*** the '187 patent.  However, on December 16, 2022, DNAG clawed back that spreadsheet.  Spectrum moved to compel.  During a January 30, 2023 hearing, the Court converted Spectrum's motion to a motion for a protective order to be filed by DNAG.  Doc. No. 230.  On March 24, 2023, the Court ruled on DNAG's motion and ordered it to produce a redacted version of the spreadsheet.  Doc. No. 278.  That spreadsheet showed that ▓▓▓ ▓▓▓ was involved in all aspects of the global prosecution of Birnboim I and III, which have always been the basis for Spectrum's claim of inequitable conduct.  Doc. No. 286-9.

In a declaration, ▮▮▮▮ also attested that the spreadsheet documented the "communications, advice and opinions" that she exchanged with ▮▮ "regarding the prosecution of DNAG's patent portfolio." Doc. No. 236-2 at ¶ 11; *see also* Doc. No. 280-1 at 2 (describing redacted columns as containing "privileged communications about … patent prosecution strategy, including future prosecution activities."). ▮▮▮▮ testified that she was the primary liaison between DNAG and ▮▮, (Ex. N at 67:4-10), which manages prosecution for all of DNAG's patent applications, (*id.* at 221:14-21) and provides direction to foreign counsel in ***all*** other jurisdictions. *Id.* at 55:4-9.

On March 30, 2023, six days after the Court ordered DNAG to produce the spreadsheet, Spectrum sent DNAG a proposed amended complaint that named ▮▮▮▮ and the specific attorneys at ▮▮ as the "who" for inequitable conduct. *See* Doc. No. 286-2, ¶ 2; Doc. No. 286-3. This was a rational litigation decision and falls well short of reckless or bad faith conduct. DNAG's request for sanctions is meritless.

## C. Spectrum Filed And Pursued Well-Supported Antitrust Counterclaims

DNAG alleges Spectrum (1) filed knowingly inaccurate Counterclaims, (2) improperly opposed DNAG's motion to dismiss; and (3) persisted even though discovery purportedly proved Spectrum's claims were untrue. DNAG's arguments lack merit.

### 1. Spectrum's Allegations Were Well Supported and Accurate

As discussed above, and as visually exemplified by the Table in Spectrum's accompanying declaration, Spectrum's documents supported that DNAG had a dominant and monopolistic market share, that DNAG enjoyed monopolistic pricing and that there were significant barriers to entry. *See, e.g.*, Doc. No. 334-11 at 219 (DNAG commands "80-85% share" and explaining how converting tests "will be a long slow process" in view of a "concentrated well established national lab industry and infrastructure"), 230 (barriers to entry), 233 (DNAG has "monopolistic market share," recognized for "high pricing" and "price gouging"); Doc. No. 334-10 at 156 (DNAG "trying to lock in pricing terms for a 5-year commitment"); Doc. No. 349-28 & Ex. K (interviews); *see also* Razai Dec. ¶ 30 (Table – visually compiling evidence).

DNAG claims that Spectrum's "corporate deponent was unable to provide factual support for its allegations, including its critical market share numbers." Mot. at 7. That is not true. DNAG acknowledges that Spectrum's witness referenced "DG Volo" and Ernst & Young "Parthenon" reports from market research companies. *Id*. The referenced documents support Spectrum's allegations of market shares, DNAG's monopolization, and DNAG's pricing and long-term contracts. *See, e.g.*, Doc. No. 334-11 at 219, 230, 233; Doc. No. 334-10 at 156 (DNAG "trying to lock in pricing terms for a 5-year commitment"); *see also* Razai Dec. ¶ 30 (Table).[11] DNAG claims that Spectrum made the allegation "at least 65%" to comply with case law (Mot. at 13), but that allegation was well supported and confidential sales data later produced in discovery showed that Spectrum's "65%" allegation was conservative—DNAG's actual 2019 market share in the pled market was ▓. Reiff Rpt, ¶ 76; *see also* Razai Dec., ¶ 30 (Table).

DNAG nonetheless accuses counsel of "manufactur[ing] frivolous market share allegations." Mot. at 13. That is false. Spectrum's market share estimates were reasonably based on available evidence and later confirmed by detailed market share calculations. *See, e.g.*, Reiff Rpt, ¶ 76; Doc. No. 334-11 at 219, 230, 233; Doc. No. 334-10; Ex K; *see also* Razai Dec., ¶ 30 (Table). Moreover, the "Ninth Circuit has held that a plaintiff need not plead market share with specificity.... Courts have found rough estimates of market share sufficient at the pleading stage." *AliveCor, Inc. v. Apple, Inc.*, 592 F.Supp.3d 904, 917 (N.D. Cal. 2022) (internal citation omitted). DNAG never challenged Spectrum's estimated market shares in its motion to dismiss. Doc. No. 41-1. Indeed, while DNAG now argues Spectrum's market share allegations were "critical," DNAG argued the opposite in its motion to dismiss. *See, e.g.*, Doc. No. 41-1 at 21 (arguing that "it is not market share that counts"); Doc. No. 78 at 7 (arguing a "comparatively large market share

---

[11] DNAG asserts that by providing documents to counsel to analyze, Spectrum's pre-suit investigation was "backwards." Mot. at 15. This is of course how nearly every case is developed, including apparently Genotek's infringement case. *See* Ex. R (Genotek interrogatory response partially claiming privilege on pre-suit investigation once information was provided to counsel). As DNAG knows, Spectrum does not have in-house counsel, so it necessarily relied on outside counsel.

1   alone is insufficient to establish monopoly power").

2       DNAG also claims that Spectrum "deliberately presented an untrue and misleading

3   picture of Spectrum as a small, struggling victim…" Mot. at 13. DNAG cites nothing in

4   support of these serious accusations, and they are false. *See id*. The Counterclaims

5   repeatedly characterized Spectrum as DNAG's "***most significant*** competitor." *See, e.g.*,

6   Doc. No. 27, ¶ 107 (making allegation three times). Spectrum alleged that DNAG was

7   using fraudulent patents to exclude its "most significant competitor," the competitor most

8   able to provide a competitive check and prevent DNAG from maintaining, or in the

9   alternative, reacquiring monopoly power. *Id*. Indeed, in keeping with DNAG's "kitchen

10  sink" approach to attacking counsel, DNAG cannot keep its story straight. DNAG argues

11  (1) in one breath, that Spectrum falsely portrayed itself as a "small, struggling victim,"

12  Mot. at 13, and (2) in the next, that Spectrum falsely identified DNAG and Spectrum as

13  the two "significant" and "major" players. Mot at 4-5. DNAG fails to explain how both

14  allegations could somehow be false. In reality, Spectrum (1) did not portray itself as a

15  "small, struggling victim,"[12] and (2) Spectrum's allegation that DNAG and Spectrum were

16  the two significant competitors was well supported. *See, e.g.*, Reiff Rpt ¶ 79; Doc. 334-1,

17  ¶ 2; Ex. Q at 193:23-194:17; 198:3-23; Doc. No. 334-11 at 226 ("Despite acknowledging

18  [DNAG's] monopolistic pricing tendencies, customers are currently willing to accept high

19  prices as they predominantly are not familiar with less costly collection device vendors.")

20  *see also* Razai Dec. ¶ 30 (Table).

21      DNAG also cites various documents attempting to show Spectrum's success as to

22  COVID sales and then makes the unsupported claim that Spectrum "alleged the opposite

23  in its Counterclaim." Mot. at 15-16. But DNAG cites nothing in the Counterclaims that

24  are purportedly the "opposite." As the Seventh Circuit colorfully observed, "Judges are

25  not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955,

26

27  ─────────
    [12] Even if the Counterclaims were misinterpreted that way, they were supported and
    reasonable. The Counterclaims reasonably (and accurately) alleged that Spectrum's

28  market share around the time of filing was "below 15%." Doc. No. 334-1, ¶ 2; Ex. L
    (Spectrum sales data).

956 (7th Cir. 1999). As explained above, Spectrum acknowledged its initial success during COVID, identified itself as DNAG's "most significant competitor" and alleged that, by asserting a fraudulent patent, DNAG was unlawfully attempting to exclude the competitor most able to provide a competitive check. Doc. No. 27, ¶ 107. DNAG's attempts to tout Spectrum's success with COVID tests **bolster** Spectrum's central theory that DNAG would harm competition if it excluded "its most significant competitor..." *Id.*

### 2.   Spectrum Opposed DNAG's Motion to Dismiss in Good Faith

DNAG next attacks Spectrum's argument in its opposition to DNAG's motion to dismiss that DNAG and Spectrum are the only major competitors. Mot. at 5. As explained above, that allegation was well supported and confirmed during discovery. *See, e.g.*, Reiff Rpt ¶ 79; Doc. No. 334-1 ¶ 2; Ex. 334-11 at 226, 230; *see also* Razai Dec. ¶ 30 (Table). Indeed, Spectrum's expert testified that competitors other than DNAG and Spectrum are "fringe" and exhibit "very little expansion," with small "estimated" shares that may be an "overstatement" of actual shares. Ex. Q at 193:23-194:17; 198:3-23.[13] Opposing a motion to dismiss against a pleading that was not objectively baseless is not sanctionable as a vexatious multiplication of a proceeding. *Frost v. LG Elecs., Inc.*, 2017 WL 2775041, at *4 (N.D. Cal. June 27, 2017) (denying Section 1927 sanctions).

### 3.   Discovery Confirmed the Counterclaims' Accuracy

DNAG claims that discovery showed the inaccuracy of the Counterclaims' allegations (1) that "Genotek is by far the largest competitor in this market, followed by Spectrum," (2) that DNAG's market share "dwarfed" the shares of competitors apart from

---

[13] DNAG argues in a footnote that Judge Ohta's purportedly "rul[ed]" that the relevant market was a "Covid" market. Mot. at 5 n.4. That misinterprets the record. If the Court had found that Spectrum did not properly define the relevant market, the Court would have granted DNAG's motion. Further, DNAG's argument is also obviously wrong given that Spectrum pled market shares in 2019, before COVID. Doc. No. 27, ¶¶ 9, 93. Moreover, in its motion to dismiss, DNAG argued Spectrum's market was too narrow, not too broad as it now asserts. Doc. No. 41-1 at 22. Further, DNAG did not suggest the parties were limited to a "Covid" market during discovery. Indeed, DNAG answered Spectrum's Counterclaim and repeatedly referenced "the alleged clinical whole saliva genetic test kit market." Doc. No. 115, ¶¶ 7-9, 86-87, 91; *see also AliveCor, Inc. v. Apple, Inc.*, 592 F. Supp. 3d 904, 914 (N.D. Cal. 2022) (the market is a "factual, rather than a legal, question").

Spectrum, (3) that DNAG controls prices and DNAG's prices have increased over time, and (4) "high barriers to entry and expansion," (5) that "there are  limited number of potential customers"[14] and (6) that  DNAG has sought to lock these customers into long term contracts."  Mot. at 5-8, 14, 20.

DNAG is wrong on every point.  As demonstrated by the evidence, each allegation was supported by evidence and later confirmed by expert testimony and evidence.  *See, e.g.*, Reiff Rpt, ¶¶ 59 n.163 (citing Doc. No. 334-11 at 230, 233; Doc. No. 334-10 at 156), 79 &, 81; Doc. No. 334-1 ¶ 2; Ex. Q 193:23-194:17; 198:3-23; Ex. T at 186883 ("[s]ecuring large, long-term contracts" was a "critical success factor"); Exs. U-Y (example contracts/quotes); Ex. Z (identifying additional contracts); Ex. K at -76011 ("[DNAG] is the only game in town … their prices have crept up."); Doc. No. 334-11 at 219, 230, 233; Doc. No. 334-10 at 140 (85% of the opportunity is concentrated in seven customers), 145, 156-162 (customer interviews); Doc. No. 334-11 at 219 (barriers), 226, 230, 231 (DNAG size); Ex. A at 35-39, 200-201 (barriers); Ex. O at 58-59 (FDA clearance) & 27-29, 164 169 (long term contracts); Ex. P at 173-74 (FDA clearance); *see also* Razai -Dec., ¶ 30 (Table – visually presenting evidence).

DNAG focuses primarily on Spectrum's market share estimates, but discovery revealed that Spectrum's allegations were accurate.  ***First***, Spectrum's Counterclaim alleged that Genotek's market share "in 2019 was greater than at least 65% and by Spectrum's estimates ***may*** have approached 80-85%."  Doc. No. 27, ¶ 93.  Confidential sales data later produced in discovery showed that DNAG's actual 2019 market share in the pled market was ▮.  Reiff Rpt, ¶ 76; *see also* Razai Dec. ¶ 30 (Table).  ***Second***, Spectrum alleged "on information and belief" the parties' market shares had returned to levels similar to 2019, which was consistent with DNAG data later made available in discovery.  *See* Doc. No. 334-1, ¶ 2 & Table 1 (DNAG's market share was rising to ▮

---

[14] Genotek claims a Spectrum document shows 400 potential customers.  Mot. at 20. Spectrum's CFO explained this customer list is company-wide and includes customers who were ***never*** leads or customers for the SDNA product.  Doc. No. 359-1, ¶ 11.  Spectrum provides services unrelated to the SDNA product like kitting and packaging.  *Id.*

and Spectrum's share was falling to ▓▓▓); Ex. L (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓)); *see also*

Razai Dec. ¶ 30 (Table). **Third**, Spectrum's market share near the time of filing was "below

15%," which was likewise consistent with DNAG data later made available in discovery.

Doc. No. 334-1, ¶ 2 & Table 1 (▓▓▓); Ex. L (sales data); *see also* Razai Dec. ¶ 30 (Table).

Even if DNAG could show some discrepancy between the Counterclaims' estimated

market shares and the actual market shares, that would not show any bad faith. DNAG

provided the sales data necessary for market share calculations **after** fact discovery. Doc.

No. 286-6. Upon carefully analyzing the data, Spectrum reasonably narrowed its case to

attempted monopolization just eight days later. Doc. No. 286-5. This is not sanctionable.

*Cortina v. Wal-Mart Stores, Inc.*, 2016 WL 4556455, at *5-6 (S.D. Cal. Sept. 1, 2016)

(sanctions not warranted following voluntary dismissal "after [] two years of aggressive

litigation" where plaintiff reasonably re-evaluated case in view of new information).

Indeed, it is fundamentally unfair for DNAG to use its own confidential sales data

produced years later to attack the estimates in Spectrum's pleading. Moreover, even if

DNAG had produced the necessary data earlier, it would not have "resoundingly refuted"

Spectrum's allegations, as DNAG argues. Mot. at 18. At most, DNAG's data reflecting

later competition between the parties supported Spectrum's fundamental theory that

DNAG was using a fraudulently-obtained patent in an attempt to exclude its "most

significant competitor." Doc. No. 27, ¶ 107. The data thus buttressed Spectrum's

attempted monopolization theory, as shown by Spectrum's sixty-seven page expert report.

*See* Reiff Rpt. DNAG does not challenge Spectrum's expert opinions. *See Nystrom v.

TREX Co.,* 424 F.3d 1136, 1150-51 (Fed. Cir. 2005) (no evidence of bad faith where

amended pleading was supported by evidence even though original pleadings was flawed).

DNAG combines two separate quotes to misrepresent the Counterclaims as alleging

"that 'long term' DNAG contracts 'has caused Spectrum to lose customers.'" Mot. at 22

(quoting Doc. No. 27, ¶ 110). DNAG cites paragraph 100 of the Counterclaims, but that

paragraph says nothing about "long term" contracts and instead alleges DNAG's

-20-

anticompetitive conduct harmed Spectrum.  Doc. No. 27, ¶ 110.  DNAG's reference to "long term" contracts is found in paragraph 97, which identifies barriers to entry and expansion, not the alleged anticompetitive conduct.  Doc. No. 27, ¶ 97.

DNAG also argues a "reasonable pre-suit inquiry would have revealed that Spectrum itself internally touted its own" long-term contracts.  Mot. at 22.  If anything, however, such facts would simply underscore that long-term contracts are even ***more*** common in the market, supporting Spectrum's allegation that such contracts constitute a barrier in the relevant market that would make it difficult for a new competitor to enter and expand.[15] Doc. No. 27, ¶ 97.  DNAG cites *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004), but that case explained the allegations required to challenge contracts as ***anticompetitive conduct*** under an exclusive dealing theory, not as barriers to entry and expansion.  The Counterclaims did not allege DNAG's contracts were anticompetitive conduct, only that such contracts created barriers to entry in the market.

Moreover, Spectrum was entirely reasonable in alleging that Genotek's conduct caused Spectrum to lose customers that would have otherwise been available.  Doc. No. 27, ¶ 110; *see also* Ex. Z.  Indeed, Spectrum's expert referenced information from Spectrum's CFO that Genotek's conduct may cause Spectrum to go out of business and fail to compete.  Reiff Rpt, ¶ 105.  Spectrum's expert submitted a supplemental report explaining that in the last quarter of 2022, Spectrum's share had fallen to ▆ and Genotek's share had risen to ▆.  Thus, as Spectrum's expert explained, the market shares appear to be moving in the direction of the 2019 shares with Genotek in a dominant position."  Doc. No. 334-5.

### 4.   DNAG's Evidence at Most Raises Factual Disputes

None of DNAG's evidence shows any flaw in Spectrum's allegations and, at best,

---

[15] Nor did Spectrum allege that the contracts were exclusive.  Long-term contracts can create a barrier without exclusivity.  For example, many of DNAG's contracts contained minimum order requirements (*e.g.*, Ex. S at 453619 (characterizing it as a "standard" term in DNAG contracts)), meaning the customer was required to accept at least a particular amount of products under the contract.  This logically creates a barrier because a customer is unlikely to switch until the minimum amount is fulfilled.

merely raise factual disputes.  First, DNAG deceptively points to market shares in a "Covid" market Spectrum did **not** plead.  Mot. at 6-7 (extensively discussing market shares in the purported "relevant market for COVID-19 testing").  Indeed, DNAG's **entire** discussion of market shares on pages 6 and 7 points to a market Spectrum did not plead, with no acknowledgement of that fact.  Mot. at 6-7.  Such misdirection cannot show flaws in Spectrum's Counterclaim.[16]

Second, DNAG relies on **annual** market share data that reflects market shares occurring **after** the Counterclaim, as Spectrum's market share increased.  As Spectrum's expert explained, such increases coincided with a surge in COVID cases and testing associated with the Delta variant in the latter half of 2021.  *See* Doc. No. 334-1, ¶ 3.  DNAG cannot seek sanctions because of unpredictable fluctuations that began to occur nearly simultaneously with the Counterclaim because of a new viral variant in a global pandemic, particularly when it did not complete production of the relevant data until after fact discovery.

Third, DNAG cites a November 2020 document and a February 2021 email touting Spectrum's initial success as to COVID sales.  Mot. at 5-6.  But neither of these documents are directed to the alleged "clinical whole saliva genetic test kits."  Doc. No. 27, ¶ 85.  Spectrum's initial success in one **portion** (*i.e.*, the COVID portion) of the alleged market cannot refute Spectrum's allegations regarding the market as a whole.  Moreover, the Counterclaims acknowledged Spectrum's initial success in 2020, but alleged that by the time of the Counterclaim, the parties' relative market shares "returned to levels similar to 2019."  Doc. No. 27, ¶ 95.  Spectrum's expert analysis confirmed the accuracy of the Counterclaims.  *See* Doc. No. 334-1, ¶ 2 (in June 2021, DNAG's market share was increasing to ▮▮▮ and Spectrum's was falling to ▮▮▮).[17]  DNAG breathlessly claims

---

[16] DNAG only briefly addresses the actual pled market in a footnote, but relies on annual data reflecting increases in Spectrum's share **after** Spectrum filed the Counterclaims.  Such does not refute Spectrum's data showing market shares in the months before Spectrum filed the Counterclaim.  Mot. at 5.

[17] DNAG also cites a February 2021 document stating that the "'invisible hand of competition' will set the market price...."  Mot. at 6.  That document fails to specify a

"Spectrum's documents showed" Spectrum's market share grew because Spectrum had the "first whole saliva test kit to receive an Emergency Use Authorization…." Mot. at 5. But Spectrum's Counterclaims alleged exactly that. Doc. No. 27, ¶ 95.[18]

Fourth, DNAG challenges Spectrum's allegations of monopoly power. Mot. at 8. But as explained above, Spectrum documents supported that DNAG had a dominant and monopolistic market share, that DNAG enjoyed monopolistic pricing and that there were significant barriers to entry. *See, e.g.*, Doc. No. 334-11 at 219, 222, 230, 233; Doc. No. 334-10 at 140, 145, 156-62; Ex. K; *see also* Razai Dec. ¶ 30 (Table). Further, as explained above, DNAG's confidential data provided during discovery, and Spectrum's expert's market share calculations, showed the Counterclaims' allegations were accurate. When discovery showed later competition between the parties, Spectrum reasonably narrowed its case to attempted monopolization. DNAG should not be permitted to seize upon such case narrowing to attack counsel's good faith.

Fifth, DNAG challenges the Counterclaims' allegations of antitrust injury. Mot. at 8. But Spectrum's expert explained in detail the harm to competition resulting from DNAG's conduct. *See* Reiff Rpt, ¶¶ 87-105. DNAG repeats its legally erroneous argument that Spectrum was required to show DNAG's assertion of a fraudulent patent already excluded Spectrum. As Spectrum explained in connection with its Motion to Amend, *Walker Process* cases focus on the harm that would have occurred *if* DNAG's lawsuit were successful. *See* Doc. No. 332 at 6-7 (collecting case law); *see TransWeb, LLC v. 3M Innovative Props., Co.*, 812 F.3d 1295, 1309 (Fed. Cir. 2016) (affirming liability for

---

particular market and is likewise months before DNAG filed its lawsuit that knowingly asserted infringement of an unenforceable patent. Doc. No. 296-9. Moreover, the reference to an "invisible hand of competition" was in response to a question as to whether the "government" would engage in "price regulation." *Id.*

[18] DNAG argues that Spectrum's product prices have been higher than DNAG's prices for "competing sales." Mot. at 8. But DNAG's decrease in pricing as to COVID products was the result of the very competition Genotek sought to exclude with its fraudulent patents. Reiff Rpt ¶ 64 & Ex. 3; Doc. No. 321-4 at 93:3-22. DNAG's prices were significantly higher for other products in the alleged market where there was less direct competition. Ex. Q at 61:19-23.

-23-

attempted monopolization based on showing of what "would have resulted **had** 3M succeeded in its suit"); *Guardant Health, Inc. v. Found. Med., Inc.*, 2020 WL 2461551, at *11 (D. Del. May 7, 2020) ("In a *Walker Process* claim…the focus is on harm to competition that will result **if** [the patentee's] lawsuit is successful."). Moreover, *Transweb* held that attorney's fees defending against a fraudulently-obtained patent, such as at issue here, "are both injury-in-fact and antitrust injury." *TransWeb*, 812 F.3d at 1310. Spectrum's allegations were based on *TransWeb*, the Federal Circuit's leading *Walker Process* precedent. DNAG's legally erroneous arguments fail to show any bad faith.

Sixth, DNAG alleges that Spectrum did not pursue particular "uses and customers" and that this shows DNAG's contracts did not create barriers to entry "for Spectrum." Mot. at 21. DNAG's argument fundamentally mischaracterizes the role of barriers to entry in Section 2 cases. The issue is whether there were high barriers to entry and expansion in the relevant market as a whole, not whether a particular competitor attempted to overcome a particular barrier. *See* Doc. No. 27, ¶ 97 (alleging market is "protected by high barriers to entry and expansion"); *Am. Pro. Testing Serv. v. Harcourt Brace Jovanovich Legal & Pro. Publn's*, 108 F.3d 1147, 1154 (9th Cir. 1997) (DNAG's cited case explaining monopoly power cannot exist without "barriers to new entry or expansion").

### 5. <u>Spectrum's Acted Reasonably in not Combining its Pending Motion to Supplement With its Motion to Amend</u>

DNAG also takes issue with Spectrum filing both a Motion to Supplement and a Motion to Amend. Mot. at 19-20. This ignores how these motions originated. Spectrum requested a meet and confer on the Motion to Supplement on February 2, 2023. Doc. No. 267-6. DNAG stalled, forcing Spectrum to wait until March to meet and confer on the motion. After Spectrum filed its motion, DNAG asked Spectrum for an extension to oppose the motion, which DNAG used to prepare and serve an intervening Rule 11 motion. Doc. No. 276. Although Spectrum later sought to amend its Counterclaim, it was anxious to get the supplement in front of the court without any further delay given that DNAG was opposing the motion at last in part based on the timing of the supplement. The motions

addressed separate issues: (1) the motion to supplement sought to add a basis for antitrust liability; (2) the motion to amend sought to remove monopolization and update other portions of the pleading.  Spectrum acknowledged once both motions were pending that it would file an omnibus pleading based on the Court's rulings.  None of this was reckless or in bad faith.  The Court's rulings on them do not change that.  *Puterbaugh v. Oorah, Inc.*, 2023 WL 3335070, at *2 (C.D. Cal. Apr. 5, 2023) (Section 1927 sanctions not warranted despite Rule 15 motion being denied as futile); *Dolores Press, Inc. v. Robinson*, 2017 WL 11596028, at *1-2 (C.D. Cal. Jan. 26, 2017) ("Seeking amendment and then reconsideration are fairly routine requests" that do not warrant sanctions, particularly where motion to amend was partially granted).

## IV.  DNAG'S MOTION FOR ATTORNEYS' FEES UNDER THIS COURT'S INHERENT POWER IS ALSO BASELESS

Inherent power sanctions "should be reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997); *accord Physician's Surrogacy, Inc. v. German*, 311 F. Supp. 3d 1190, 1197 (S.D. Cal. 2018).  Thus, the standard for imposing inherent power sanctions is quite similar to the standard for imposing Section 1927 sanctions.  *See Kohler*, 2011 WL 2448338 at *3 (reciting same standard as *Primus* and *Physician's Surrogacy*).  DNAG, moreover, does not argue inherent-power sanctions are subject to a different standard than Section-1927 sanctions.  Accordingly, for all the reasons explained above, no sanctions should be imposed under this Court's inherent power.

## V.  CONCLUSION

For all these reasons, the Court should deny DNAG's motion.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 15, 2023         By: /s/ *Ali S. Razai*
                                   Joseph F. Jennings
                                   Ali S. Razai
                                   Paul N. Conover
                                   Nicholas M. Zovko
                                   Brandon G. Smith

                              Attorneys for Defendant
                              SPECTRUM SOLUTIONS L.L.C.

# CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2023, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following person(s):

| | |
|---|---|
| Brian M. Kramer<br>BMKramer@mofo.com<br>John R. Lanham<br>JLanham@mofo.com<br>Drew A. Hillier<br>dhillier@mofo.com<br>MORRISON & FOERSTER LLP<br>12531 High Bluff Drive, Suite 100<br>San Diego, California 92130-2040<br>Telephone: 858.720.5100 | David D. Cross<br>DCross@mofo.com<br>MORRISON & FOERSTER LLP<br>2100 L Street, NW, Suite 900<br>Washington, D.C. 20037<br>Telephone: 202.887.1500<br>Facsimile: 202.887.0763 |

I certify and declare under penalty of perjury under the laws of the State of California that I am employed in the office of a member of the bar of this Court at whose direction the service was made, and that the forgoing is true and correct.

Executed on November 22, 2023, at Irvine, California.

Claire A. Stoneman

Certificate of Service
Case No. 3:21-cv-00516-RSH-DDL